### STATE v. JACOB F. FORCE.[1]

March 27, 1907.

Nos. 15,007—(20).

**Larceny—Evidence.**

Appellant was convicted of grand larceny in the first degree; the charge being that, while vice president of the Northwestern National Life Insurance Company, he feloniously appropriated to his own use a certain bank check for $675, the property of said company. *Held*, the ownership of certain bank stock, the validity of its assignment to appellant, whether the board of directors had knowledge thereof, the manner in which dividends were paid and appropriated by appellant, the character of the company's reports, the method of bookkeeping, appellant's connection with the company, his various operations and deals with other officers, and his contracts for salaries and commissions—all such matters were proper lines of investigation for the purpose of throwing light upon the charge alleged.

1 Reported in 111 N. W. 297.

**Rulings on Evidence.**

No reversible error was committed by the trial court in ruling upon offers of evidence, in instructing the jury, or in refusing appellant's requests. No prejudicial error occurred on account of the prosecuting attorney's closing address to the jury. The evidence sustains the verdict.

Appeal by defendant from an order of the district court for Hennepin county, Brooks, J., denying a motion for a new trial, after a trial and conviction of grand larceny in the first degree. Affirmed.

During the assistant county attorney's closing address to the jury (see syllabus), objections were taken to certain things said by him. Among others exceptions were taken respectively to the following:

"And by the way, gentlemen, if he [the defendant] should have been tried on that indictment, he would simply have stood up before this court and said 'Your Honor, I may have stolen the stocks, but it was in 1902 and—you can't convict me.'" This was changed to "could have said." "I say this defendant 'could have.' And do you not think he would? And, if he would not, don't you think his lawyers would? They would stand up in court and say: 'Your Honor, he may have stolen the stock; but they didn't find it out until too late. More than three years have gone, and you have got to let him go.'"

"I will never forget, gentlemen, I will never forget that day when these insurance officials marched into court, with a jolly, jaunty air, listened to their indictments, and with a smile retired; and spoke of it and advertised it as their little 'tea party,' jocularly asking each other, 'Have you been indicted yet?'"

"The reputation of this city for business integrity and commercial honesty is at stake in this case. Neither this city or county, or its people, is responsible for the misdoings of the officers of this insurance company. But I say when those misdoings, when that mass of filth and corruption has been exhibited and shown in court to a jury of twelve men, that the reputation of this community is at stake, and the people of this state and of this country will be anxious to know whether just punishment is to be meted out to the men who have caused the name and the reputation of this city to be dragged in the dust."

*Keith, Evans, Thompson & Fairchild* and *Flannery & Cooke,* for appellant.

*Edward T. Young,* Attorney General, *Al. J. Smith,* County Attorney, *John F. Dahl,* Assistant County Attorney, and *John N. Berg,* for the State.

LEWIS, J.

Appellant was convicted of the crime of grand larceny in the first degree under an indictment which charged that March 13, 1903, he was vice president of the Northwestern National Life Insurance Company of Minneapolis, and appropriated to his own use the personal property of the company, which consisted of a bank check of that date for $675, drawn by the liquidating committee of the Metropolitan Bank of Minneapolis on the Northwestern National Bank, payable to the order of the Northwestern National Life Insurance Company.

The defense is based upon the claim that the stock had been assigned and delivered by the insurance company to appellant in payment of unpaid salary due him as its general manager during the years 1898, 1899, and 1900, and that the check rightfully belonged to him as a part of the dividends on the stock. To a correct understanding of the case it will be necessary to trace the history of the association and appellant's connection therewith.

In 1885 the Northwestern National Life Insurance Company was incorporated under the name of the "Northwestern Aid Association of Minneapolis," and according to its articles and by-laws the receipts were distributed into three funds: A mortuary fund, for the payment of death and disability claims; a reserve or guaranty fund; and an expense fund, to be used for the ordinary expenses of the association. The name of the association was later changed to the "Northwestern National Life Insurance Company." In 1887 appellant became the medical director of the company, and in 1888 the secretary of the association, when Dr. Edwards became president, and together they managed the affairs of the company until 1895, when they entered into an agreement, the purport of which was that on payment to him by appellant of $50,000 Dr. Edwards was to resign as president and give up his connection with the company. Edwards did resign and sever his connection with the company, and appellant personally paid

him $30,000; but before resigning, and at a meeting held in January, 1895, in which Edwards participated, the company entered into a contract with appellant, employing him as its general manager for the term of fifteen years at a salary of $12,000 per annum and a commission of three-twentieths of one per cent. of all the insurance in force on January 1, in each year.

The record shows that about that time a brother of Dr. Edwards was employed as a special adjuster at a salary of $4,000 per annum, and continued in such employment for several years, when the fact came to the attention of the insurance commissioner. Objection was then made to it, and the company were advised that the parties who had authorized the payment of the salary be compelled to restore the money to the company. The state claims that the brother was so employed pursuant to an understanding with Edwards that in consideration thereof no further payments by appellant than $30,000 would be required. All that the record discloses on this point is that the matter was adjusted by a committee and the payment of the salary ceased after the year 1900.

The next occurrence which should be noted is that December 26, 1895, the contract then existing between appellant and the company was changed, reducing the salary to $10,000 a year; the commission part of it remaining as before. In 1897 the company made application for permission to transact business in the state of Illinois, and the officer from that state who examined the company objected to appellant's contract for salary and commission, and the result was that August 30, 1897, by a writing on the margin in the minute book, appellant waived that portion of his contract referring to commission. The minute book shows, under date of January 26, 1898, a resolution increasing appellant's salary as general manager to $15,000 per annum. This resolution will be referred to later. It is sufficient here to state that appellant claims never to have drawn any part of the increase for 1898, 1899, and 1900.

In 1900 negotiations were opened between another insurance company—the National Mutual Insurance Company, doing business in Minneapolis, of which W. F. Bechtel was president and G. F. Getty secretary—and the Northwestern National Life Insurance Company,

through appellant, with a view to consolidating the two companies, which resulted in an agreement in October, 1900, between appellant upon the one hand, and Bechtel and Getty on the other, to the effect that appellant and his son should resign as president and secretary, and Bechtel and Getty be elected as president and secretary, respectively, and that the business of the Bechtel company should be reinsured in appellant's company. The consolidation finally took place on February 23, 1901. Appellant and his son resigned, and Bechtel and Getty were elected to their positions, and the Northwestern National Life reinsured the risks of the National Mutual. During the negotiations for consolidation a secret agreement was entered into between appellant and Bechtel, by the terms of which appellant was to be paid $100,-000 by Bechtel. Appellant was elected vice president, Bechtel president, and Getty secretary. February 27, 1901, a few days after the consolidation was perfected, four certificates of stock representing one hundred thirty five shares of the capital stock of the Metropolitan Bank of Minneapolis, belonging to the Northwestern National Life Insurance Company, were assigned to appellant by Bechtel as president and Getty as secretary. Each assignment was executed upon a separate piece of paper and was not attached to the certificate which it purported to assign. The assignments and certificates were delivered to appellant, but no transfer of the stock was made on the stock book. Several dividends were paid upon this stock during 1901, 1902, and 1903, by checks drawn by the bank, or its liquidating committee, after it went into liquidation, payable to the Northwestern National Life Insurance Company. They were then indorsed by the Northwestern National Life Insurance Company, by Bechtel as president, and made payable to the order of appellant. The check upon which the indictment is founded, however, was indorsed by the Northwestern National Life Insurance Company, by appellant himself as first vice president.

The evidence is conclusive that before the alleged assignment of the stock on February 27, 1901, it belonged absolutely to the Northwestern National Life Insurance Company. The burden was upon the state to prove beyond a reasonable doubt that the check was fraudulently appropriated by appellant, and in furtherance of that purpose

it was necessary to prove that the transfer of stock to appellant was void. The state made out a case by showing that the stock belonged to the company on February 27, 1901, and was on that day turned over to appellant without authority and the check in question appropriated by him. Appellant attempted to explain the transaction, and based his defense upon the claim that the company was indebted to him in the sum of $15,000 for salary as manager for the years 1898, 1899, and 1900, and that the stock was assigned to him in full payment of the debt. "Q. When these four certificates of stock, with the assignments, were delivered to you by Mr. Getty, for what purpose did you understand they were delivered to you? A. For the salary due me at that time that had not been paid." Mr. Bechtel was called as a witness for the state, and testified that at the time the consolidation took place he was shown appellant's contract for salary as manager, as spread upon the minutes; that the contract provided for $12,000 per annum and a commission of three-twentieths of one per cent.; that appellant informed him the salary was afterwards reduced to $10,000 and the commission part of it canceled upon objection by a representative from Illinois, but that his attention was not called to the resolution of January 26, 1898, increasing appellant's salary to $15,000; and that no such claim had ever been made to him. Mr. Bechtel accounts for the assignment of the stock to appellant upon the ground that it was a payment under the agreement for $100,000 made in connection with the consolidation of the two companies; that the stock was turned over in lieu of money. Mr. Austin, a witness for the state, testified that in 1895 appellant told him (Austin) that Bechtel owed him some money and had turned over the stock in payment; that he had every reason to presume that Bechtel had acquired title to it.

It will thus be noticed that the important question in the case is whether the stock came into appellant's hands in good faith, as he claims. We must assume that, if the stock was turned over to him to apply on the $100,000 contract, such payment was illegal, as the company was not a party to the agreement and its funds could not be used for such purpose. But if appellant in good faith acted upon the assumption that the stock belonged to Bechtel and was turned

over in payment by him under the $100,000 contract, then the crime alleged would not be made out, even if the back salary claimed had never been authorized, or, if authorized, had never been paid. These different features have a direct bearing upon the main question, and the evidence should be looked into with some care.

Considerable light is thrown on the transaction by a consideration of the so-called $100,000 contract, by which appellant agreed, as he claims, to surrender his contract for salary as general manager, of date January 26, 1898, whenever he should be paid the sum of $100,-000 by Bechtel or the company. It was shown during the trial that after this agreement $10,000 was paid to appellant by Bechtel during the negotiations for the consolidation, termed "earnest money," and the further sum of $19,349 on March 4, 1901. In addition to this sum paid by Bechtel, appellant received from the company, under his contract of January 26, 1898, $10,000 for each of the years of 1901 and 1902. January 15, 1903, he executed the so-called "commutation contract," by the terms of which he released his contract of employment in consideration of the further sum of $33,848.36. This contract of January 15 was in writing, between himself and the Northwestern National Life Insurance Company, and has already been referred to. Under this agreement appellant received $10,000 in 1903 and $5,000 in 1904. Some time during 1904 he released the company from any further payments and accepted the individual notes of the officers of the company for the balance then remaining unpaid. So it appears that appellant had two contracts for the retirement of his contract of January 26, 1898, one with Bechtel at or about the time of the consolidation, by the terms of which he was to receive $100,000, and the other of January 15, 1903, by the terms of which he was to receive $33,848.36. It also appears that after the consolidation Bechtel became the active manager of the company, and appellant's connection with it was practically nominal; but he continued to draw a salary of $10,000 under his original contract until the commutation thereof was effected, so that he received a total of $83,197.36 from Bechtel and the company after the consolidation. The jury were entitled to consider all of this evidence in determining whether or not the stock of the company was received by appellant in good faith.

As already stated, appellant's defense having been based upon the claim that his salary as general manager was $15,000 from January 26, 1898, and that $10,000 only had been paid at the time the stock was turned over to him February 27, 1901, it is important to inquire whether the defense was sustained by the evidence. It appears from the minute book that a meeting of the board of directors was held January 26, 1898, at which was present appellant, as president, and his son, as secretary; also J. B. Hingely, T. F. Allen, and E. L. Higgins. At this meeting the following resolution was passed:

> Resolved, that in view of the fact that Dr. J. F. Force, under date of August 30, 1897, voluntarily surrendered and canceled that part of his contract as manager, dated December 26, 1895, that related to commission, it is hereby ordered that an addition be made to his salary of $5,000 per year, commencing January 1, 1898, and continuing during the life of the present contract.

In answer to the claim of appellant that no part of the increase had been paid for the years 1898, 1899, and 1900, the state introduced checks in evidence showing that during those years appellant had received money in excess of $15,000 a year. In explanation of this appellant claimed that the salaries of the other officers were paid by him personally out of this amount; that he paid his son, as secretary, $600 a month. It was not shown that any of the salaries except the manager's were ever fixed or authorized by the board of directors, and the explanation rests entirely upon appellant's declaration that the excess of $10,000 was paid out to the other officers and employees of the company. The state also insisted that the resolution never was in fact passed by the board of directors, and the entry in the minute book was a fabrication, having been inserted at a subsequent time. This claim is based upon the fact that the record of the meeting was in the handwriting of appellant, although his son was then secretary; that no one of the directors purporting to have attended the meeting was called as a witness to substantiate the record; also, that the financial condition of the company did not justify it, if, as claimed by appellant, the increase was not drawn out because the expense fund would not warrant it.

Another matter in this connection is the fact that in the agreement of January 15, 1903, appellant's salary was referred to as $10,000 per year. That portion of the contract applicable reads as follows:

> Witnesseth: That, whereas, by contract dated December 26, 1895, the said first party appointed and employed said second party its general manager for a term beginning on that date and ending January 1, 1910, at a salary of $10,000 per year, which said contract is still in force and effect.

It is claimed by the state that, if appellant's contract had in fact called for $15,000, it would have been so inserted in this agreement. Appellant made no attempt to explain this discrepancy, and during his negotiations with Bechtel no reference was ever made to any other amount of salary than $10,000. Another incident bearing upon this question is the fact that in the report of the company verified by appellant January 21, 1901, under the head of "Salaries, Rents, Expenses, etc., Due or Accrued," no mention was made of the alleged liability for salary.

Another point relied upon by the state to indicate that the transfer of the stock was not a valid sale for the purpose of liquidating a valid indebtedness is the fact that the stock was carried on the books of the company during 1901 and 1902 as an asset. Bechtel testified that in January, 1902, the insurance commissioner made an examination of the company's books, and, finding the entry of the stock an asset of the company, called for the stock. It was Sunday, and appellant was at church, and Bechtel called him out and asked for the certificates of stock, and was told they were in a vault in a certain bank. The two men then called on the president of the bank for the purpose of securing entrance and obtaining the stock, but were unable to get into the vault on that day. It does not appear whether, after that time, the stock was obtained and shown to the insurance commissioner, or whether he was satisfied as to its existence. The state contends that inasmuch as the assignments of the certificates were executed upon independent pieces of paper, when a printed form for that purpose was on the certificates, no entry being made upon the books to show an assignment, the secrecy surrounding the whole transaction, and

the effort made to secure the stock to exhibit to the commissioner, all point directly to a scheme on the part of appellant to use the stock of the company for the purpose of discharging a personal obligation of Bechtel to appellant, and at the same time permit the board of directors, those interested in the company, and the insurance commissioner to assume that the stock still belonged to the company.

In answer to this, appellant calls attention to the fact that there was nothing unusual in not having the stock certificates transferred upon the bank stock book; that the checks by which the dividends were paid showed upon their face they had been indorsed to appellant, thus furnishing evidence open to inquiry as to where the money went; and that finally, in 1902, appellant delivered the stock certificates and assignments to Holton, the officer representing the liquidating committee of the Metropolitan Bank, and on the 31st day of December, 1903, wrote to Holton from Brookline, Massachusetts, claiming the stock as his own. Holton testified that he never had any conversation with appellant with reference to the stock, did not know when the stock and assignments were left with him, but stated that the check for the dividend referred to in appellant's letter was indorsed by Bechtel and was applied on appellant's note, as directed.

If, under all the evidence, the jury were satisfied that the stock was fraudulently converted by appellant to his own use, then the jury were further justified in finding that the check upon which the indictment is founded was also fraudulently converted by him. The letter from Brookline with respect to the check therein described was a matter entitled to due consideration by the jury; but the apparently open manner in which appellant treated that check as his own is by no means conclusive evidence that he was entitled to collect the dividends and appropriate them to his own use. Although at the time the indictment was returned the statute of limitation had run against a prosecution for the conversion of the stock, the statute had not run as to the conversion of the check given in payment of a dividend upon the stock. All of the evidence pertaining to the assignment and use of the stock is pertinent only in that it tends to show that the check given for the dividend was also the property of the company when it was appropriated by appellant.

The learned trial court submitted the case to the jury by stating the main facts brought out in the trial and the various contentions of the state and the defense, dividing the issues into three parts: (1) Relating to the title or ownership of the check; (2) relating to its possession; and (3) relating to the intent with which it was appropriated by defendant. Each phase of the case was taken up and treated in detail, and every fact having a bearing upon the guilt or innocence of appellant was carefully submitted. We have examined the assignments of error directed to the rulings on evidence, to the charge of the court, and to the court's refusal to submit appellant's requests, and find no substantial error in any of them.

The assignment of the stock to appellant was absolutely unauthorized by the board of directors. Under the articles of incorporation the management of the affairs of the company was placed under the control of the board of directors, which consisted of not less than five nor more than nine members, who were authorized to conduct all the affairs of the association by means of motions and resolutions duly adopted, or through officers and agents by such board duly authorized and ratified. According to the evidence the board of directors never authorized the assignment or transfer of the stock to appellant, and it does not appear that any member of the board, except Bechtel, president, and Getty, secretary, ever knew that any such assignment and transfer had been made until long thereafter. A by-law of the company, as amended in January, 1900, provided that any act done by any officer of the association which should have been done by the board of directors was as valid and effectual as if done by the board, with a quorum present, if afterwards ratified by a majority of the board. Conceding, which we do not, that such a resolution would authorize the president and secretary to dispose of the company's property in payment of a debt due one of the other officers, the alleged transfer of the stock to appellant was never ratified, no meeting of the board was ever called for that purpose, and no action was ever taken by the board in any respect pertaining thereto. Nor, as already stated, was there any consent or approval thereof by any of the members of the board acting individually, excepting Bechtel and Getty. The facts do not warrant any claim that the company was estopped by acquiescence

.from denying the validity of the assignment. The possession of the stock by appellant and his receipt of the dividends paid. thereon did not tend to prove that the stock was legally turned over to him, upon the theory of ratification or estoppel, unless the transaction was understood by the board of directors and acquiesced in after a knowledge of all the facts.

Several assignments are directed to the closing address to the jury of the county attorney. We have read the remarks as printed in the record, and, while we consider the same a severe arraignment and a strong plea for conviction, we do not discover that the argument was not warranted by the facts. We do not intend to approve of the practice of calling names and appealing to prejudice or passion to sway a jury; but, when the evidence forms the basis of the argument, the discretion of the trial court as to its effect must be conclusive, unless such discretion is abused. In this instance, while the prosecutor indulged in some denunciation, we find no reason for differing from the opinion of the trial judge that the jury were not by reason thereof prevented from fairly and impartially weighing the evidence, and deciding the case upon the merits.

It is not for us to cast imputations upon the actions of men placed on trial before the tribunals of justice. Our duty, in any given case, is performed when we have ascertained that the trial court proceeded according to the recognized methods in legal investigations. However, this important case, charged with such dire consequences to appellant and the public, should not be passed without a word more with reference to the facts.

During appellant's long connection with the company he always occupied the most prominent position for at least fourteen years, and seems to have built up a reputation as a trustworthy officer and as an honorable citizen. But, when the true nature of his dealings with the company was laid bare before the jury, it became apparent that from the very inception the business was conducted by him with a view to advance his personal welfare. The object was to draw from the funds the largest amount possible. The Edwards deal, the commission-salary contract of 1895, the increase of salary in 1898, the $100,000 transaction between himself and Bechtel in 1901, all speak in the most pointed language to the fact that the trusted manager and president

was drawing upon all the possible resources of the company for his own advantage, rather than serving the interests of those who with confidence had placed their funds under his control. It is possible that, intending to be honest and deal fairly with his policy holders, carried away with inflated notions as to the growth and soundness of the institution, he felt justified in withdrawing such large sums for his personal use—funds which should have been conserved and employed to strengthen the financial condition of the company. Whatever may be said in extenuation of appellant's contention in that respect, no court should fail to condemn, as utterly unsound, the proposition that for a money consideration an officer of trust may surrender his position in order that another might succeed to his opportunities. Appellant laid himself open to the charge of having purchased his position and then again selling it to another. His record was before the jury, and they were entitled to consider the entire history of the company and appellant's relations to it in determining his guilt or innocence of the offense alleged. The jury have concluded that the charge was sustained, and we find no reason for interfering with their decision.

Order affirmed.