## STATE v. CARL F. HACKER AND OTHERS.[1]

December 15, 1922.

No. 22,928.

**Conviction for grand larceny sustained.**

1. The evidence on the part of the state is sufficient to prove that defendants obtained money by false pretenses and that all of the defendants participated in the crime.

**Evidence of similar crimes admissible.**

2. Evidence of other similar crimes was properly received as proof of a general plan to defraud and as proof that promises made to the complaining witness could not be redeemed.

Defendants were indicted by the grand jury of Hennepin county charged with the crime of grand larceny in the first degree, tried in the district court for that county before Montgomery J., who when defendants rested denied their separate motions to dismiss, and a jury which found them guilty as charged in the indictment. From an order denying their separate motions for a new trial, defendants appealed. Affirmed.

*Wright & Wright* and *Seth Lundquist,* for appellants.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Assistant Attorney General, *Floyd B. Olson,* County Attorney, *William Markve* and *William C. Larson,* Assistant County Attorneys, for respondent.

HALLAM, J.

Defendants were indicted for grand larceny in that they obtained from Margaret Evans $2,721 by false pretenses. All were found guilty and each appeals.

1. The first contention is that there is no evidence to sustain the verdict. We think the evidence is sufficient. The first outstanding fact is that Margaret Evans was induced to part with money of

[1]Reported in 191 N. W. 37.

the amount stated, with never at any time a prospect of its return. The method by which it was obtained from her was in short as follows: Margaret Evans was a young woman employed in a bank in the little town of Spring Green, Wisconsin. Defendant Elizabeth Riek had formerly lived at Richland Center, which is near Spring Green, but had lived some years in Minneapolis. In February, 1920, Elizabeth went to the bank where Margaret was employed and engaged her in conversation. They spent some time together and Elizabeth proceeded to tell about the wonderful opportunities for advancement in Minneapolis; told how she had sold a farm for $8,000 and had doubled her money, and of her liberal wages; suggested she should think Margaret would want to get out of that small place and come to the city where there were better opportunities. Asked by Margaret if she thought she could find employment in Minneapolis, Elizabeth said "certainly." After returning to Minneapolis Elizabeth wrote Margaret three letters. In one she asked Margaret to come to Minneapolis to "accept a position with a very large concern; the work was easy, good pay, and good future." Later she wrote a letter, "very urgent," to "come immediately," that a wonderful opportunity was open with a very large concern and she would hold the position open. In response to this, Margaret went to Minneapolis. She was taken by Elizabeth to a suite of three offices in a prominent office building. The names of four corporations were on the door. The offices were elegantly furnished. Elizabeth said "what a beautiful office * * * to work in," and told Margaret that was the place where she was to work.

After a few minutes, Elizabeth took her out to a farm near Elk River, 30 miles away. There she met the other defendants. There defendant Carl Hacker took her in charge, took her "horoscope," flattered her, told her about the wonderful proposition he had, the Standard Farms Development Company. He said the old company was the Standard Farms Company, but that he had bought out that company and was going to organize the Standard Farms Development Company for the promotion and development of farm lands. He said it was a wonderful proposition, well fixed financially,

very large assets. The Elk River farm, he said belonged to the company. He proposed to make Margaret treasurer of the company at a salary of $150 a month. Then he wanted her to invest her money in the corporation, agreed to give her one share of preferred and one share of common stock for the price of one share, and assured her that the dividends would be from 12 to 15 per cent and that in a few months she would have her money back also. He said he had invested $50,000, and each of the other defendants $2,000; said Elizabeth was a bookkeeper; Ida Edstrom a stenographer, and Frances Hacker a clerk keeping house on the farm. He enjoined secrecy. After keeping her at the farm for more than a month he obtained $550 of her money. Later, by further impressing her with the dignity and emoluments of her position as treasurer, assuring her that she would have her name on the door, have the combination of the safe and the handling of all the money, assuring her that the company was about to build a very large hotel on the "farm" and taking her to various furniture houses to look at the equipment, assuring her that he had a license from the State Securities Commission to sell stock of the corporation, threatening that another candidate would get her job if she did not hurry up, he prevailed on her to go to Spring Green and procure from her father more money. While she was there he wrote her and telephoned her, and finally succeeded in getting her to produce bonds aggregating $2,600. After receipt of the first amount, at the suggestion of Frances, Carl gave Margaret a note—his personal note—and, on receiving the subsequent amount, he gave her another similar note. Though she had worked in a bank, she seemed to have little appreciation of what this meant. When he gave her the first note, he said it was merely a receipt. She asked: "What shall I do with it?" He told her to keep it and she did.

In fact she never received any salary, never received any money as treasurer, never had opportunity to perform any duties as treasurer. Finally she complained that there didn't seem to be anything for her to do and that she was disinterested. After some further conversation, Carl said: "You are too honest, you get right out of my office." At his suggestion she resigned as treasurer and director.

He prepared a resignation which released the "corporate enterprise" of all claim. She asked his attorney if it was all right for her to sign, he told her "yes," and she signed it. Some time later she demanded her money back. She was met by the answer from Carl: "I can't give it back; I spent it * * * I squandered it * * * I will give you nothing; we will skin you out of everything; * * * I will give you no stock in our company; * * * now remember, you stay away from lawyers, * * * I am too smooth for them; * * * that is why I am here in this office, they can't catch me." All of these facts are uncontroverted, save that the attorney gave a different version as to what took place when the resignation was signed. Except for this one bit of testimony, none of the defendants offered any defense.

The substantial representations made were false. The corporation never had assets of consequence, in hand or in prospect. Carl had invested no such sum as he claimed. There was no prospect and no intention of making her a real treasurer nor of paying her a salary, nor of giving her stock, nor of her realizing dividends. Carl never received permission from the State Securities Commission to sell stock or securities, but on the contrary his applications showed no substantial assets, and one was rejected, with the memorandum that the sale of the securities proposed to be sold, would, in the opinion of the commission "work a fraud on the purchasers thereof."

The law would be very inadequate to the demands of justice, if it did not stamp Carl's conduct as not only fradulent but criminal. Clearly he obtained money by false pretences. It may be surprising that Margaret should have been deceived by such shallow pretence, but it appears that others were also deceived, among them lawyers, bank clerks and others of more business experience than had she. Defendants contend that the transaction was merely a loan of money to Carl. They call it "an ordinary business transaction" of loaning money at 6 per cent interest. Clearly it was not. It matters little that Carl put the papers in the form of a loan, nor would it matter much if it were in fact a loan. The misrepresentation, the fraud, the false pretence, to induce her to part with her

money are not "ordinary business transactions." It is said the statements made were mere promises. Some of them were, but they were made without possibility or intention of fulfilment, and were therefore a fraud.

Carl's guilt is beyond question. The guilt of the others is not so clear, but we think the evidence sufficient to establish their guilt. Elizabeth actively participated in this transaction from the start. Ida's participation was not so active or constant, but yet it was frequent, and it must have been with knowledge of the fraud.

It is argued particularly that the evidence is not sufficient to sustain the conviction of defendant Frances Hacker. We think the evidence is sufficient. She was present during some of the most important transactions and often participated.

In her presence, Carl stated that all of the defendants had money invested in the Standard Farms Development Company, and told of the proposition to make Margaret "treasurer of our new company." One evening at the supper table, with defendants all present, they put up to Margaret the proposition of investing money. Carl asked her to write home and get it, and then said "now watch her squirm." Margaret said she could get it by writing home and the letter was at once written that produced the first check. Frances was present when this money was paid over to Carl. He asked Margaret to keep back $50 for expenses. Frances shook her head. Margaret then said, if she was to receive $150 a month, she wouldn't need the $50, and Carl, in the presence of all the defendants, then promised Margaret $150 a month for the time she was on the farm, and said the other girls were to get the same. A week or two later, Frances said at the dinner table: "Carl * * * you haven't given Margaret anything yet to show for her money," and suggested that he had "better write a slip or something to show for the money," and it was then he gave Margaret the first note, the device by which defendants now endeavor to class the transaction as a simple loan. While Margaret was endeavoring to get the second and larger amount from home, there was brought to her, at the farm one night, a special delivery letter from her father. The contents are not disclosed, but when she read it she

cried bitterly. All the defendants, including Frances, were present, and all reassured her. Carl assured her her money was safe and the corporation perfectly safe. Frances said: "Never mind, * * * they call Carl a crook, but then he hasn't crooked you yet; that's all right, we will make it all right." Carl suggested sending a telegram and a letter to Margaret's father, and a telegram and letter to her home bank. Frances sat up in bed and told Carl what to say in the letters and telegrams. Carl wrote them, and, at his direction, Margaret signed them. These missives, and some follow-up telephone conversations, brought the securities from which the money was obtained. There was participation by Frances on other occasions. In our opinion the verdict as to Frances should stand.

Defendants complain that the court received evidence of several witnesses as to similar representations made to them. The testimony was that, in each case, substantially the same grotesque course of conduct was followed as in the case of Margaret. There was the horoscope, the offer of a job, of bonus stock with big returns, the exploiting of plans for a large hotel and the personal note device.

The testimony was admissible for several reasons:

It comes within the principle of such cases as State v. Monroe, 142 Minn. 394, 172 N. W. 313, holding that testimony of other offenses is admissible where it tends to show a general scheme, or plan, or system, as to defraud, and is therefore corroborative of the evidence of complainant. In fact one of these witnesses testified to this: (Record p. 323.)

"A. Why, Mr. Hacker asked me to go on the road with him and help fleece the small country town bankers. He said all you had to do is to put on a big front and show them about the various schemes and corporations you had in mind and show a financial statement of assets and properties that was owned by them and give them a personal note. He said, 'That's the way to get them, that's the way I get all of them.' * * * 'That's all you got to give them, is just your personal note,' he says, 'lawyers can't get me or anything else, I have got that all fixed.' "

Then the evidence of these witnesses makes it further clear that the promises made by Carl were beyond all hope of redemption. He promised office after office at large salaries. Taken in the aggregate the office salary budget as promised would reach approximately $1,500 a month. The evidence was properly received.

Order affirmed.

BROWN, C. J. (dissenting.)

I dissent.

In my view of the evidence in this case the verdict of guilty against defendant Frances Hacker is not sustained; at least the evidence taken in all its parts is so doubtful of her active culpable participation in the transaction that she should be given another trial. I concur in the opinion in all other respects.

QUINN, J. (dissenting.)

I concur in the view as expressed by the Chief Justice.