## STATE v. MARVIN L. KLINE.*

124 N. W. (2d) 416.

August 30, 1963—No. 38,481.

*Harry H. Peterson,* for appellant.

*Walter F. Mondale,* Attorney General, *Sydney Berde,* Special Assistant Attorney General, *George M. Scott,* County Attorney, and *Per M. Larson,* Assistant County Attorney, for respondent.

---

*Certified to U. S. Supreme Court January 30, 1964.

Rogosheske, Justice.

Defendant was indicted, tried, and convicted of larceny in the first degree for obtaining money from the Sister Elizabeth Kenny Foundation, Inc., his employer, in violation of Minn. St. 622.01 and 622.05, by falsely representing that as the executive director he was entitled to receive a salary increase from $25,000 to $48,000. His motion for judgment notwithstanding the verdict or for a new trial was denied and he appeals.

The assignments of error supporting defendant's claim that he was denied a fair trial present the following questions for review:

(1) Whether the evidence is sufficient to support the conviction.

(2) Whether the trial court committed prejudicial error in the instructions to the jury.

(3) Whether the opening statement made by the prosecution referring to a claim of collateral misconduct, ruled inadmissible during trial, constituted prejudicial misconduct.

The indictment charged the crime of larceny by false pretenses. In substance it alleged that defendant, with criminal intent, obtained and received payment of an increase in his salary as executive director by presenting the following letter to Harvey M. Dean,[1] director of finance:

"Dear Mr. Dean:

"The salary structure for the position of Executive Director has been reviewed, and you are hereby authorized and directed to make the following adjustments in that classification:

"Effective as of July 1, the annual salary of Marvin L. Kline, Executive Director, is to be increased by $11,000, payable from the Eastern Area Fund (of which $7,500 shall be charged to Eastern Area Operations and $3,500 charged to Eastern Area Institute Operations) and an additional $12,000 from the International Training Center at the Elizabeth Kenny Institute in Minneapolis.

"Yours very truly,

R. D. Onan

Treasurer"

---

[1] Mr. Dean died approximately one week after the indictment was issued.

It was alleged that this letter was false and untrue and that defendant either knew that Robert D. Onan had not been authorized to increase his salary and falsely represented to Mr. Dean that Mr. Onan had such authority, or, if defendant knew or believed that Mr. Onan had authority, the letter "had not been signed by the said Robert D. Onan, or that his signature had been obtained by fraud or deceit." It was further alleged that in any event defendant presented the letter with intent to deceive and defraud the foundation and that payment of the salary increase was made solely in reliance upon the letter.

■ In reviewing the sufficiency of the evidence we should emphasize that we do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the jury to reach that conclusion.[2]

In the light of this settled rule we are satisfied that the jury could have found the following to be true. Defendant, age 57, a graduate architectural engineer and former alderman and mayor of Minneapolis, was one of the organizers of the foundation and had been its executive director practically since its inception. The Sister Elizabeth Kenny Foundation, Inc., is a nonprofit corporation which, before its incorporation as such in 1942, was called the Kenny Institute. It was organized and developed for the charitable purpose of making available to the general public a particular method of treatment for poliomyelitis. From defendant's observations as a public official he became convinced that this method of treating polio, developed by Elizabeth Kenny, an Australian nurse, was reasonably effective. His prominence in community affairs, together with his conviction, ability, and experience enabled him, by dedicated efforts, to enlist many persons of ability, standing, and influence to bring the foundation into existence, first as a mere local institution and later

---

[2]State v. Pankratz, 238 Minn. 517, 57 N. W. (2d) 635; State v. Lux, 235 Minn. 181, 50 N. W. (2d) 290; State v. Gavle, 234 Minn. 186, 48 N. W. (2d) 44; State v. Schabert, 222 Minn. 261, 24 N. W. (2d) 846; State v. Waddell, 187 Minn. 191, 245 N. W. 140.

in developing it into an organization of national and international renown.

The foundation was operated through an annual meeting of members who elected a board of directors, which in turn elected officers and an executive committee from its members as well as an executive director. Between meetings of the board and the executive committee, all members of which served without pay, the affairs of the foundation were conducted by defendant as executive director and his staff, the chief members of which were Mr. Dean, director of finance, and Fred Fadell, director of public information, all full-time salaried employees. By 1955 most of the original directors and officers had been replaced by personal friends and associates of defendant, who recruited them to become active in the work of the foundation. Defendant was held in high esteem and recognized by those closely associated with the work as the key leader of the foundation. Until the foundation became the subject of an investigation by the Minnesota attorney general in 1960, defendant enjoyed the unquestioning loyalty and confidence of his business and personal associates. This was particularly true of the members of the board of directors, including R. D. Onan, who was elected treasurer in 1957. Although the initiative, development, and supervision of the overall policy of the foundation were vested in the board, the evidence convincingly establishes that they exercised very little initiative and supervision over the affairs of the foundation. As the trial court expressed it in a comprehensive memorandum accompanying its order, "The suggestions, the recommendations, the initiative and the action were supplied primarily by or through defendant. (While it is not within the province of this Court to adjudge the care, or the lack of same, with which the Directors and Officers conducted themselves, it is at the least fair to say that they trusted defendant completely and to an extent not easily visualized by one who has not heard the evidence. This trust was founded in part upon defendant's prior public service, their close personal association with him, his many years with the Foundation and extensive knowledge and control of its affairs and perhaps a rather forceful personality. * * *)"

When defendant officially became the foundation's executive director

in 1946, the board set his salary at $12,500. In recognition of the value and effectiveness of his services, his salary was increased in 1950 to $17,500, in 1952 to $25,000, and there were conversations about a further increase among several board members who regarded his services as so extensive and productive as to be deserving of a more substantial salary. In June 1955, for the obvious purpose of favoring the defendant with job security, the bylaws were amended to provide: "He [the executive director] should be hired for a term of not less than three years at an annual stipend to be agreed upon between the Board of Directors and Executive Directors. The said contract of employment to be in writing and signed by the President and Secretary of the Foundation and the Executive Director." Promptly thereafter, in July 1955, such a contract for a 5-year term at an annual salary of $25,000, plus expenses necessary to the office in an unlimited amount, was executed.

The salary increase involved here was never incorporated into any written contract either by an amendment to the 5-year contract or otherwise. Nor does the evidence disclose any record of formal action by the board of directors or the executive committee specifically authorizing a revision of the salary provision of the written contract. On the same day the bylaws were amended requiring a written employment contract, the first of a series of $50,000 single-premium, annuity contracts was authorized to be purchased for defendant as deferred compensation, apparently because of a heart attack suffered by defendant in 1954. The resolution authorizing this action and a recommendation that 4 more like contracts be purchased, one each year for 4 years, was passed at a meeting of the executive committee "sitting as a Board of Governors of the Minnesota Five State Area." This was the first time that minutes, separately maintained apart from the regular minute book, disclosed a meeting described as the "Board of Governors of the Minnesota Five State Area." Unlike the minutes of the board and of the executive committee, the pages were not consecutively numbered and copies were not distributed to the members of the board. Subsequent minutes of the meetings of the executive committee denoted as such board of governors disclose authority for the purchase of additional annuity contracts. One set of such minutes purports to be a record of a

meeting held on July 17, 1957. It was at this meeting that defendant claims Onan also received authority to adjust his salary. Defendant received two of the $50,000 annuities outright and by their terms he was permitted to cash them at will subject to being then employed by the foundation. He did receive the value of one contract presented for payment in March 1960, but his attempt in September 1960 to cash the first contract purchased for him was refused because he was no longer employed by the foundation.

The above-quoted letter from Onan was presented by defendant to Dean in October 1957. It is undated and the customary initials of the secretary-typist do not appear, although Mrs. Katherine Wilcox, defendant's long-time private secretary, who served him when he was in the private practice of his profession, testified to a belief that she was the typist. Neither the old nor the new salary was set forth in the letter. A photostat was presented by defendant to Dean and by him to Mr. Charles T. Helgeson, the chief accountant, for processing. Upon receipt of the letter, Helgeson remarked, "That's a whopping big increase." Dean responded, "You've got Mr. Onan's signature, what more do you want?" Both of these men effected payment of the salary at the increased rate in sole reliance upon the letter. Defendant was paid at the increased rate from July 1, 1957, until March 28, 1960, when he resigned. Not a single officer or member of the board, including those members serving as the executive committee and Mr. Onan, was aware of the salary increase until March 1960, when it was disclosed as a result of an investigation by the attorney general. Nor did they know that the "annuity program" included five separate $50,000 annuity contracts. The only persons having knowledge of the salary increase were Dean, Helgeson, Mrs. Wilcox, Mr. J. George Zimmerman, an accountant, called as a defense witness, who audited the records of the foundation from 1951 through 1959, and the defendant. Other than the testimony concerning salary discussions prior to the time when the letter was presented, defendant at no time thereafter acknowledged or expressed appreciation for or made comment upon the salary raise to board members.

A large part of the testimony related to the main dispute in the evi-

dence, namely, Onan's authority to increase defendant's salary, and if such authority existed, whether Onan knowingly exercised his authority by means of the letter. There was evidence which permitted the jury to find that the board delegated such authority to adjust the salary of some 400 foundation personnel, including defendant, to the executive committee and this committee in turn had subdelegated such authority to Onan; that this was a practice followed in the past, the board either adopting the recommendations of defendant and the treasurer directly or ratifying the actions taken by the executive committee as reported by defendant. There was also evidence contradicting Onan's testimony that he had no knowledge of the letter, its contents, or import; his disavowal of any authority to raise defendant's salary; and his insistence that he had no recollection of reading or signing the letter and would not have signed if he had known its import. The testimony of defendant, corroborated by the testimony of others concerning customary practices, directly conflicted with Onan's testimony. Thus, the jury was permitted, as urged by the defendant, to find that he had received the money "under a claim of title preferred in good faith, even though the claim be untenable."[3]

On the other hand there was persuasive evidence that the board, consistent with the bylaws, had not delegated authority to increase defendant's salary and that the minutes of the meeting of the "Board of Governors for the Minnesota Five State Area" on July 17, 1957, which contained a recital that such authority was subdelegated to Onan, as well as the meeting itself, were a complete fabrication, being part of a calculated scheme on the part of defendant, experienced and knowledgeable in corporate proceedings, to defraud the foundation; that any evidentiary presumption arising out of the existence of minutes that a meeting actually occurred on July 17, 1957, and that it was properly constituted[4] was clearly overcome by the conflicting testimony of those members therein recorded as present and participating. Further, the evidence showed that if loose business practices permitted defendant to assume Onan's authority, or subsequent ratification, he nevertheless took

[3]Minn. St. 622.16.
[4]Heintzelman v. Druids' Relief Assn. 38 Minn. 138, 36 N. W. 100.

deliberate advantage of the inattention he encouraged Onan to pay to his responsibilities and betrayed the confidence and trust reposed in him by Onan and the members of the board by deceiving Onan into signing a letter knowing that he would not read it or be aware of its contents and effect.

These fact issues were submitted to the jury under clear and impartial instructions. The jury rejected defendant's claims as untrue and accepted as true the testimony and inferences supporting the prosecution. As observed by the trial court, "No cogent reason has been advanced for his friends to falsify their lack of knowledge of the raise. In fact, on cross-examination, almost without exception, the various Board members were anxious to vouchsafe their admiration for defendant."

The verdict necessarily implies a finding either that Onan had no authority to order a salary increase and that defendant knowing this obtained payments at the increased rate by falsely representing otherwise; or that if Onan's authority in fact existed, or defendant believed it did, he secured Onan's signature by fraud or deceit. There is express statutory authority to allege the means of committing the offense in the alternative,[5] and we conclude there is ample evidence to support the jury's conclusion that the offense was committed by using either or both methods of fraudulent representation.

■ As indicated, one of the alternatives alleged in the indictment included a claim that Onan's signature was a forgery. At trial the state did not specifically concede that evidence was insufficient to justify submitting this issue. However, the court before the arguments and the charge indicated agreement with defendant's position that the evidence required a finding that Onan in fact signed the letter. On appeal the state with commendable candor concedes that the defendant's position is correct and that it would have been error to submit the issue. The state contends that it was not submitted, while defendant argues that a part of the charge referred to this claim and could have been understood by the jury as one of the fact issues submitted since the court did not specifically withdraw the issue as defendant requested. A review of the record clearly discloses that no real controversy existed about this

[5]Minn. St. 628.14.

matter. It is equally clear that defendant made no specific request to withdraw this as a single issue, but rather requested a general instruction that there was "no evidence of forgery, fraud, deceit, trickery or any other illegal or improper method used by defendant" to obtain Onan's signature.

An overall view of the record on this point leaves us with the distinct impression that the parties and the court understood this issue to be out of the case and that it was not intended to be submitted. It is true that the indictment which alleges forgery was read and was followed by a summary of the claims of the parties, including the claim of forgery. Nevertheless, it cannot be persuasively argued that the charge when read and viewed in its entirety[6] submitted the issue. The question affirmatively submitted concerning this phase of the indictment was whether Onan knowingly signed the letter as claimed by defendant, or whether his signature was obtained through fraud, deceit, or trickery as claimed by the state. Thereby the issue of forgery was effectively withdrawn by nonsubmission. At the close of the charge, no exceptions were taken which indicated that defendant desired the court to specifically withdraw the issue. In view of the complications of the case we are impressed with the clarity of the instructions. We are obliged to hold that the record and the charge provide no reasonable basis for the claim that the jury was misled or could have reached a verdict of guilt upon a finding of forgery, which we, of course, would regard as constitutionally impermissible because of the lack of evidentiary support.

All other assignments challenging the instructions have been examined. None of them disturb our conviction that the charge understandably informed the jury of the issues of fact and the applicable law and was commendably impartial and complete.

■ Our greatest concern has been over defendant's claim that the prosecution committed prejudicial misconduct in its opening statement. Before any testimony was taken, the prosecution, announcing a desire to define the issues in order to guard against possible prejudice in the admission of evidence or in the opening statement, submitted a written

---

[6]State v. Axilrod, 248 Minn. 204, 79 N. W. (2d) 677; State v. Billington, 241 Minn. 418, 63 N. W. (2d) 387.

offer of proof. The offer was in the nature of a pretrial disclosure outlining the state's evidence. It revealed an intention to also offer testimony that defendant secretly received money from the foundation, apart from the salary increase, by incurring unauthorized expenses of a personal nature, by causing the foundation to purchase a quarter of a million dollar annuity program for his benefit without the full knowledge or approval of the board, and by entering into contracts with mailing companies in Chicago in connection with fund-raising campaigns whereby substantial fees and other benefits were paid to others—principally Fadell—without the complete knowledge or the authority of the board, and that defendant, by secret arrangement with Fadell, received "kickbacks" paid through him of approximately $20,000 a year between 1952 and 1957; that these payments from Fadell terminated just prior to the unauthorized salary increase and coincided with defendant's need for money by reason of a tax liability. The state contended that the evidence was relevant to motive or intent, tending to show that defendant was engaged in a common plan or scheme to defraud the foundation by taking advantage of his position of trust. Defendant objected to the offer as incompetent, irrelevant, and prejudicial and asked the court to confine the prosecution to trial of only those facts which were embodied in the indictment, requesting that the court instruct the prosecution not to refer to any such collateral transactions in the opening statement.

The court reserved ruling until such time as the evidence was offered and it was agreed that separate offers out of the jury's hearing would be made and full argument allowed. After an extended discussion, the court ruled provisionally that the prosecution could not refer to any collateral transaction in the opening statement except the one which related to the claim of "kickbacks" from Fadell and then only to the extent that the state expected to prove that defendant suffered a reduction in his income in the amount and at the time disclosed by the offer.

The opening statement was brief and conformed strictly to the court's restrictions, making no reference to any claim that defendant received these payments in secret, referring to the arrangement simply as an agreement that Fadell had with defendant "to split his income from the

Chicago mailing outfit." Thereupon defendant recorded the same objections voiced when the offer of proof was made, and after the first witness testified very briefly, added to the record by coupling his exceptions to the provisional ruling with a motion for a mistrial.

Well past the midpoint of the trial, when the evidence regarding "kickbacks" was submitted by renewing the offer of proof, the court, after extended argument, ruled the evidence inadmissible. Upon the state's request, and apparently after a discussion with counsel, the court instructed the jury that defendant's objection to questions concerning financial transactions between Fadell and defendant were sustained and that although the state in "good faith" had declared its intention to go into the matter, the court ruled it improper to do so. Defendant at that time made no claim that the correcting instructions were inadequate or renewed his motion for a mistrial.

Defendant does not challenge the court's determination that the opening statement was made in good faith upon the belief that the evidence was admissible, but argues that it nevertheless constituted misconduct and was so highly prejudicial that it could not be corrected by any action of the trial court short of granting his motion for a mistrial. The court found no misconduct or prejudice. We have reached the conclusion that the prosecution did not commit misconduct and that reversing the trial court's decision that defendant was accorded a fair trial free from prejudicial error would not be warranted upon the record.

The prosecution may outline the facts in the opening statement which he expects to prove to aid the jury in following the testimony. This statement is not evidence but a recital of factual claims expressed with an intention and expectation that testimony will be offered and received to support them. If the facts are stated in good faith with reasonable grounds to believe that the evidence to be offered in proof of such facts is admissible, no error is committed.[7]

Here reference to the collateral transaction was unquestionably made in good faith with the express permission of the court. Exceptional care was used to ascertain the probable admissibility of the supporting evidence before the opening statement was made. Clearly

---

[7] 23A C. J. S., Criminal Law, § 1085.

the prosecution cannot be charged with misconduct in the sense of a calculated design to inject prejudice. The error, if any, was occasioned by the court's provisional ruling followed much later by the ruling that the evidence was inadmissible. While the jury may have inferred that it was misconduct for defendant and Fadell to "split" the latter's income from the Chicago company, we fail to see how this transaction could be interpreted by the jury as a separate crime or as unrelated to the crime charged. The jury heard no evidence or any further mention of the matter as the offer of proof was made during direct examination of Fadell and out of the hearing of the jury.

When defendant's objection was sustained, the error committed by the provisional ruling was revealed. If the opening statement prejudiced defendant's substantive rights, its impact occurred at this time. It seems reasonable to infer that defendant, not renewing his motion for a mistrial or requesting additional corrective instructions, must have considered the reference to be less prejudicial than the words, skillfully and comprehensively employed to protect the record, would indicate.

Moreover, the admissibility of the evidence was addressed to the discretion of the trial court. We are not prepared to say that the court would have committed error in admitting the evidence. In a case of this kind the evidence may properly cover all the facts and circumstances which tend to show the course of dealings between the parties concerned before and after the offense.[8] It is competent to show the defendant's financial situation[9] and generally any acts or transactions which bear on defendant's effort to wrongfully divert funds[10] or tend to show a common scheme or plan in perpetrating crimes involving fraud.[11] The trial judge was in the best position to balance the factors for and against admission of this evidence. We are inclined to believe that secretly obtaining money by way of "kickbacks" was as much a

---

[8]State v. Force, 100 Minn. 396, 111 N. W. 297.

[9]State v. Rosenswieg, 168 Minn. 459, 210 N. W. 403; State v. Lytle, 214 Minn. 171, 7 N. W. (2d) 305.

[10]State v. Thompson, 241 Minn. 59, 62 N. W. (2d) 512.

[11]State v. Hacker, 153 Minn. 538, 191 N. W. 37; State v. Bock, 229 Minn. 449, 39 N. W. (2d) 887.

part of the defendant's plan to take advantage of his position of trust as was his conduct in funneling every decision through himself, fabricating minutes, obtaining annuity contracts, and his actions in securing an increase in salary. However, the complexities of the transaction may well have required a volume of testimony disproportionate to its probative value and therefore properly excludable in the discretion of the trial court.

Considering that the reference to this transaction was made in good faith with the permission of the court, that the supporting evidence was admissible or inadmissible upon the discretion of the trial court, and that a cautionary or corrective instruction was given following the ruling excluding the evidence, we hold that the prosecution did not commit misconduct and that no reversible error resulted from permitting the transaction to be referred to in the opening statement.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.