FIELD et al. v. WESTERN LIFE INDEMNITY CO. et al.

(Circuit Court, N. D. Illinois, E. D. November 25, 1908.)

No. 27,893.

1. EQUITY (§ 150*)—BILL—MULTIFARIOUSNESS.
   Where a bill filed against several persons involved matters of the same nature, forming a connected series of acts intended to defraud and injure plaintiff, in which all the defendants were concerned and each had an

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

interest in some material part of the suit, the bill was not multifarious, though all were not jointly interested in each act.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 371–379; Dec. Dig. § 150.*]

**2. CORPORATIONS (§ 320*)—BILL BY STOCKHOLDERS—DEMAND ON CORPORATION TO SUE.**

A bill by members of a mutual insurance society to recover funds misappropriated by the society's officers, and alleging that it would be useless to apply to the board of directors to proceed against the officers who controlled the board, is not within equity rule 94, requiring stockholders to demand action by a corporation before suing for the corporation's benefit in their own name.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1429½; Dec. Dig. § 320.*]

**3. CORPORATIONS (§ 316*)—OFFICERS—SALE OF OFFICIAL POSITION.**

Defendant G. for many years had been manager and in control of an insurance society through proxies. He manipulated the board of directors, and his services had been such that his acts were never questioned. He was made a director, and had a contract, that had four years to run, by which he received commission on insurance issued. This he transferred to defendant R. for $125,000, which R., who was notoriously insolvent, procured from a bank. Immediately thereafter and on the same day R., who had been manager of another insurance company, sold its list of policy holders, which was valueless, to defendant company for $200,000, from which sum he repaid the money borrowed from the bank and appropriated the remainder to himself, after which he caused G.'s commission agreement to be extended for 25 years. *Held*, that G. occupied a position of trust, which he could not sell, and that he, being put on inquiry as to the purpose of the transaction, was liable for the amount received to the corporation.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 316.*]

**4. CORPORATIONS (§ 316*)—MISUSE OF FUNDS.**

Defendant R., who was insolvent, purchased the office of general manager of defendant insurance society from the incumbent for $125,000, which he obtained as a part of the consideration of a sale immediately made thereafter to defendant society of a worthless list of policy holders in another insurance company in failing circumstances. *Held*, that the president of defendant company and R., having participated in such transaction, were responsible for the return of such money to defendant company.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 316.*]

Newman, Northrup, Levinson & Becker and Gregory, Poppenhusen & McNab, for complainants.

Frank E. Gavin and James E. Munroe, for defendant Gray.

West, Eckhart & Taylor and Thomas J. Graydon, for defendant company.

R. A. Burton, for defendant Rosenfeld.

R. S. Folsom, for defendant Moulton.

KOHLSAAT, Circuit Judge. The amended and supplemental bill herein seeks to compel defendants Gray, Moulton, and Rosenfeld, and each of them, to refund to the defendant the Western Indemnity Company the amounts of money paid wrongfully to them, respectively, by said company, and for other relief.

The bill alleges, in brief, that the defendant Gray was the organizer

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the Knights Templars' & Masons' Life Indemnity Company in 1884, and that in 1905 the name of said company was changed to "Western Life Indemnity Company"; that from its incorporation down to about February, 1905, said Gray was the active manager of said company; that he had full control of its direction, and at all said times, by means of proxies solicited by and sent to him, perpetuated and continued himself in control of the company until he retired from its management. It is further therein alleged that in this way he procured a contract from the company, whereby he was to receive a certain commission upon insurance issued, which contract was ultra vires and void; that in February, 1905, Gray entered into negotiations with defendant Rosenfeld with a view to Gray's retirement as manager, and the substitution of Rosenfeld; that the said contract at that time had but four years to run, and was of little or no value, not in any case exceeding in value $25,000; that Rosenfeld was obliged to come to Gray's terms, whereby Gray should retire as manager, and the directors should resign, so that their places might be filled by Rosenfeld; that at that time Rosenfeld was notoriously insolvent; that he was the manager of the Life Insurance Company of Pennsylvania; that Gray then resigned as manager, and Rosenfeld succeeded to his position as manager, and to his rights under said contract; that Rosenfeld procured a pretended loan from the Western Trust & Savings Bank of Chicago for $125,000, which he paid to Gray as a consideration for the substitution of himself for Gray above named, and then caused a pretended contract to be made, by which he agreed to turn over to the defendant company a list of the policy holders of the Pennsylvania Company, which was of no value, for a consideration of $200,000; that he thereupon took $200,000 of the assets of the defendant company, from which sum he repaid the $125,000 loan, and appropriated the remaining $75,000 himself; that thereafter Rosenfeld caused the compensation agreement obtained from Gray to be extended 25 years, and proceeded thenceforth to exercise the powers formerly belonging to Gray until he severed his connection with the company. It is further alleged that all the directors were his tools; that defendant Moulton had knowledge of and participated in his wrongful acts, and was rewarded by an increase of his salary from $1,500 to $10,000 per annum, of all which acts Gray was cognizant at the time of his retirement; that both Moulton and Gray knew that Rosenfeld was insolvent, and that he, Rosenfeld, was scheming to convert the remaining property of the company to his own use. Answers were duly filed, and the cause was referred to the master, who thereafter filed his report, and the matter is now before the court on exceptions to that report.

Some objection is made to the bill for multifariousness. While there is some diversity of the facts as applied to the cases of Moulton and Rosenfeld on the one hand, and Gray on the other, and the relief sought from them, respectively, varies, yet the subject-matters of the several claims set out in the bill pertain to the same series of transactions, and are so interlinked and so interdependent that, if relief is to be granted, they must all be considered together. The objection of multifariousness addresses itself to the sound discretion of the court. It is meant as an aid rather than a restraint. Bracken v. Rosenthal (C. C.) 151

Fed. 136. In Brinkerhoff v. Brown, 6 Johns. Ch. (N. Y.) 139, it was held by Chancellor Kent that a bill filed against several persons involving matters of the same nature forming a connected series of acts, all intended to defraud and injure the plaintiff; and in which all the defendants were concerned, though not jointly in each act, was not multifarious. This was followed by the Supreme Court in Graves v. Corbin, 132 U. S. 571, 10 Sup. Ct. 196, 33 L. Ed. 462. In Williams v. Crabb, 117 Fed. 193, 54 C. C. A. 213, 59 L. R. A. 425, the Circuit Court of Appeals for this circuit say:

"It is not indispensable that all parties should have an interest in all the matters contained in the suit. It will be sufficient if each party has an interest in some material matters in the suit, and they are connected with others."

The objection of multifariousness is, therefore, deemed to be not well taken. Nor can it be seriously claimed that in a case of this character the provisions of equity rule 94 apply. The bill alleges that it would be useless to apply to the board of directors to proceed against the defendants, and that such is the case clearly appears. Where such an application would evidently be unavailing, the rule does not apply. County of Tazewell v. Farmers' Loan & Trust Company (C. C.) 12 Fed. 752; Ranger v. Champion Cotton Press Co. (C. C.) 52 Fed. 611; Young v. Alhambra Mining Company (C. C.) 71 Fed. 810; Rogers v. N. C. & St. L. Ry. Co., 91 Fed. 299, 33 C. C. A. 517; Columbia Natl. Sand Dredging Co. v. Washed Bar Sand Dredging Co. (C. C.) 136 Fed. 710; 12 Cent. Dig. "Corporations," §§ 792, 817.

It is the contention of complainant, in part, that Gray, having disposed of his position with the insurance company to Rosenfeld for $125,000, thereby became liable to pay that sum over to the company. It is a familiar principle of law as stated in State v. Force, 100 Minn. 396, 111 N. W. 297, that—

"no court should fail to condemn as utterly unsound the proposition that for a money consideration an officer of trust may surrender his position in order that another might succeed to his opportunities."

Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541; Wardell v. U. P. Ry. Co., 103 U. S. 651, 26 L. Ed. 509; 14 Am. & Eng. Ency. (2d Ed.) 1002; Sugden v. Crossland, 3 Sm. & Giff. 192; Gaskell v. Chambers, 26 Beav. 360; Bent v. Priest, 86 Mo. 475; McClure v. Law, 161 N. Y. 78, 55 N. E. 388, 76 Am. St. Rep. 262; Heineman v. Marshall, 117 Mo. App. 546, 92 S. W. 1131.

Defendant Gray insists that the rule of law is not applicable in his case. Let us see. He was the long-time sole head of the company business. He fathered it. He was trusted with control of the majority of the membership rights, through proxies. He manipulated the board of directors, and was practically at all times the arbiter of the company's destinies. His manner of service had been such that his acts were never questioned, nor seemed to have deserved it prior to this transaction. No official duly elected, whether president, secretary, or director, of any corporation, was ever more potent in shaping his corporation's affairs. Moreover, latterly he was made a director. It is incontestably shown by the proofs that he was practically the whole

corporation, so far as manipulation of its affairs was concerned. Defendant Moulton, as president, and the several members of the board of directors, seem to have been used only for the purpose of compliance with the statutory requirements. So far as the record discloses, the trust was faithfully discharged for a number of years until the confidence of the policy holders in his management seems to have been absolute. He was their trusted representative. In Am. & Eng. Ency. of Law (2d Ed.) vol. 14, p. 1002, it is said:

"A general manager of a corporation has been defined to be a person who really has the most general control over the affairs of the corporation, and who has knowledge of all its business and property, and can act in emergencies on his own responsibility, who may be considered the principal officer."

Certainly the position of defendant Gray, whether by virtue of his holding a statutory office or by virtue of the confidence and powers vested in him by the policy holders through many years of faithful service, brings him fully within the reason of, and, therefore, within the rule as laid down in the case of trustees and directors and other officials, even though it be conceded that his legal duties would not necessarily have charged him with those obligations.

"Wherever," says the Supreme Court of Illinois in Davis v. Hamlin, supra, "one person is placed in such a relation to another by the act or consent of that other, or the act of a third person or of the law, that he becomes interested for him or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated."

And the same rule is stated by Mr. Justice Field in Wardell v. U. P. Ry. Co., supra, as follows, viz.:

"The law, therefore, will always condemn the transactions of a party in his own behalf, when, in respect to the matters concerned, he is the agent of others, and will relieve against them whenever their enforcement is reasonably resisted."

The master finds that Gray stipulated with Rosenfeld that the latter, on the consummation of the deal, would succeed to all the privileges and capacities which he had enjoyed which would insure to Rosenfeld an opportunity for advancement in the management of the company even beyond those possessed by him. The master also finds that the sale by Gray was a "sale of the office of general manager and director, with the powers and privileges which it was represented to possess," and that such sale was in direct violation of the fiduciary capacity which he held with the company, and that Gray is liable to the complainants for the use of the defendant company for said sum of $125,000.

It appears that Gray's contract with the company had only about four years more to run; that the business of the company was on the decline; that, by resolution of the board of directors, Gray's contract compensation was changed from a commission to a flat sum of $12,000 a year; that the business outlook of the company was not hopeful, and that an offer of $125,000 for what Gray could sell was excessive to a degree which could not have failed to put Gray upon notice that some raid upon the company reserves was contemplated. It further appears that Rosenfeld's record up to that time was such as to cast suspicion

upon the transaction; that Gray was not reasonably diligent in ascertaining what Rosenfeld's business character was; and that he was overcome by the dazzling opportunity to relieve himself from the uncertainties of his position and the burden of looking after the interests of those who blindly confided in him, and appropriate to himself the enormous sum of $125,000. It does not affirmatively appear that he was cognizant of Rosenfeld's scheme to loot the funds of the corporation. It may be that he only closed his eyes. That he might, by reasonable diligence and the exercise of that caution required of one in his position of trust—a caution which would have instinctively led him to advise himself definitely in the premises had he been still desirous of protecting the policy holders, who relied wholly upon him—have ascertained the truth with regard to Rosenfeld and his scheme, does not admit of controversy. Under the circumstances, to shut his eyes was fraud, actual and constructive.

The $125,000 seems to have been paid in the morning, and the $200,-000 procured in the afternoon. Little light is thrown upon the manner in which Rosenfeld obtained from the Western Trust & Savings Bank a loan of $125,000. Later, on the same day, he got $200,000 from the company, ostensibly for the list of names and addresses, membership and applications, and whatever else constituted the Insurance Company of Pennsylvania, which he was apparently carrying about with him. Just exactly the relationship between these two transactions is not made plain. Rosenfeld is shown to have had nothing with which he could secure a loan for $125,000. He merely says:

"I made arrangement for the money with my bankers, the Western Trust & Savings Bank; that was repaid to them out of this $200,000 that same afternoon that I got the $200,000."

The master further reports that on the same day, at a meeting of the special executive committee, consisting of Moulton, Moore, and Rosenfeld, it was agreed to buy the Pennsylvania Company for $200,-000, and such action was carried out by the committee; that such action was contrary to law and the interests of the corporation; that the Pennsylvania Company was then in failing circumstances, and soon after went out of existence as a going company; that no reasonable effort was made to ascertain the value of said Pennsylvania corporation; that the transaction was not advantageous to the corporation defendant; and recommends that a decree be entered against Moulton and Rosenfeld for the $200,000 and interest as above stated.

The evidence discloses the fact that, preliminarily to the entrance of Rosenfeld upon his scheme to appropriate the funds of the company, Moulton, then president, was given to understand that his salary, which had been $1,500 per year, would be raised to $10,000. When asked by Rosenfeld if he would favor the proposed change of management whereby he would take an active part in the company at a salary of $6,000 a year, he replied, according to Rosenfeld, that "a man would be foolish to resent opportunity when it knocked at his door." The sum to be paid Gray was discussed at the same time. Rosenfeld later told Moulton that he proposed to turn in the Pennsylvania Company for $200,000. Moulton said:

"I see now that your idea is that the money you are to pay for Mr. Gray's contract you really get back directly from the Knights Templars' & Masons' Life Indemnity Company."

And Rosenfeld adds:

"That is, he would not give me credit for being a man that would pay out the $125,000 for a contract that only had four years to go without seeing a way to get my money back."

It was then agreed that Moulton's salary should be $10,000. It nowhere appears that in the long run any benefit would accrue to the company from the alleged sale of the Pennsylvania Company to defendant corporation. Moreover, Rosenfeld, as manager and director, was bound to do all he could for his company. The whole affair is tainted with fraud, in which Moulton must be held to have acquiesced. Clearly, the holding of the master was right. This attempt to relieve the corporation defendant of all but its shell was an unlawful act, for which those who participated in it should be held liable for the full amount taken.

Objection is made to the report as a prima facie adjudication of the facts that the reference was not by agreement. Such, however, is not the case. The reference was accepted by both sides. Even were it not so, the report is sustained by the evidence.

The exceptions of complainant to the report do not commend themselves to the court, and are overruled.

So far as not disposed of hereinbefore, the exceptions of defendants are, and each of them is, overruled, and the report of the master is approved. Complainant's counsel may prepare a decree accordingly, making provision for the application of any moneys received upon either or both of said decrees as credits pro tanto upon both of them, in such manner as to satisfy both of them whenever the total amount taken from the indemnity company, with interest, shall have been attained, and adjusting the rights between the several parties thereto thereafter, so far as may be done in this proceeding.