**INSURANSHARES CORPORATION OF DELAWARE v. NORTHERN FISCAL CORPORATION, Limited, et al.**

No. 10041.

District Court, E. D. Pennsylvania.
Sept. 10, 1940.

Samuel H. Kaufman, Emil Weitzner, William Glatzer, and Howard W. Fensterstock, all of New York City, and I. Emanuel Sauder, of Philadelphia, Pa., for plaintiff.

Sherwin T. McDowell, John V. Lovitt, Ballard, Spahr, Andrews & Ingersoll, Ernest R. Von Starck, Arthur Littleton, and Morgan, Lewis & Bockius, all of Philadelphia, Pa., for defendants.

. KIRKPATRICK, District Judge.

This is a suit brought by a corporation against its former officers, directors, certain of its former stockholders, and others, to recover damages incurred by the corporation as a result of the sale of its control to a group who proceeded to rob it of most of its assets. The plaintiff is an investment trust, specializing in shares of small life insurance companies.

A number of the defendants have not been served with process. Those before the Court are three Philadelphia banks, formerly stockholders, and William W. Hepburn, their representative on the board of directors.

Certain of the defendants were, prior to December 21, 1937, the owners of 75,933 of the corporation's total outstanding 284,-032 shares. These defendants will be referred to collectively as the management group. This group consisted of the Philadelphia banks, with 23,106 shares, and their agent, Hepburn; Blair (the president of the corporation) and his associates, Simmons, Moore and Burnell (all former directors), and Ogden, with 24,111 shares; the Continental Bank, with 26,569 shares (subsequently taken over by Fahnestock & Co.); and Logan, receiver of the Seaboard Continental Corporation, with 6,647 shares. The board of directors of the corporation was composed entirely of this management

group or their nominees. The defendants, Robb, Morris and Solomont, who bought control and who, with their satellites Quint, Stanton, Tracy and Hansell, looted the corporation, constitute the Boston group.

There is little dispute about the main facts. On December 21, 1937, the management group transferred the control of the corporation to the Boston group, none of whom had ever had any interest of any kind in it. With the control, as that term is here used, went plenary power under the by-laws to sell, exchange or transfer all of the securities in the corporation's portfolio, as well as access to and physical possession of them. In this case, acquisition of control was the indispensible first step of a scheme, planned by Robb, Morris and Solomont with the connivance of Paine, Webber & Co., brokers, the purpose of which was to strip the corporation of its valuable assets, leaving its mere shell to the remaining stockholders. The project was carried out with thoroughness and dispatch, but its subsequent steps and its disastrous results to the corporation are not in dispute and need not be detailed here.

The actual transfer was made in accordance with a program to which the Philadelphia group assented and the steps of which they followed. Immediate and complete passing of control was ensured by the successive resignation of the old directors, each resignation being followed by the election of a new member of the board, on the nomination of the Boston group. At the same time, the management group sold and delivered their stock to the Boston group.

■ The defendants have insisted throughout the case that the transfer of December 21, 1937, was simply a sale of stock, the passing of control being merely a normal concomitant, and most of their argument was based upon this premise. This view, however, I think is fundamentally wrong. If the whole record be read, I do not see how the transaction can be considered as anything other than a sale of control, to which the stock sale was requisite, but nevertheless a secondary matter. The fact is that the Boston group were interested in only one thing, namely, to have a free hand with the corporation's portfolio for a few weeks, and all they needed for that purpose was to be able to name and control the officers and directors. Perhaps there would have had to have been some modifications in their procedure, but prac-

tically everything they did could have been done without their owning more than directors' qualifying shares. As a matter of fact, they bought only about 27% of the outstanding issue, and, throughout their operations, they were never anything but minority stockholders. Of course, I am not suggesting that the purchase of the stock was not a sine qua non for the success of their plans. It assured them, temporarily, of noninterference from stockholders, since the majority, who had bought for investment, could be counted on to remain inert. It would have been absurd to expect such acquiescence from the management group, had they retained any stock interest, and equally absurd to expect them to part with control, without at the same time getting out of their investment in the corporation. Hence the necessity for the purchase of the stock. The buyers were primarily interested in getting control of the corporation together with such stock ownership as would make that control secure and untrammelled, and the sellers were primarily interested in getting as much money as possible for what they had to sell—both the control and their interest in the assets.

The price is strongly indicative of the true nature of the transaction. The sellers obtained $3.60 a share at a time when the price of the stock in the over-the-counter market was $1 to $1.25, and when the book value was $2.25—a figure substantially higher than could have been realized on actual liquidation. The history of the bitter dispute between the Continental Bank and the rest of the management group, beginning in June of 1937, shows that the latter, although they had no desire (and most of them no special capacity) to operate the corporation, were not content to liquidate and take the cash and actual market value of the securities represented by their shares, but were determined to obtain the additional premium which a sale, carrying with it control of the corporation, would bring. Confirmation is given by the fact that from June 1937 the principal activities of the managers consisted of negotiations for the sale of their stock. The facts that the first of the potential purchasers turned out to be irresponsible and that they had only the vaguest notion as to the identity of the second (who withdrew at the last minute) were apparently no discouragement.

Assuming then, as I think we must, that what is involved here is primarily a sale of control, it is an incontrovertable fact that

the act of the management group in selling control to the Boston group was the thing which made possible the latter's criminal operations.

Those who control a corporation, either through majority stock ownership, ownership of large blocks of stock less than a majority, officeholding, management contracts, or otherwise, owe some duty to the corporation in respect of the transfer of the control to outsiders. The law has long ago reached the point where it is recognized that such persons may not be wholly oblivious of the interests of everyone but themselves, even in the act of parting with control, and that, under certain circumstances, they may be held liable for whatever injury to the corporation made possible by the transfer. Without attempting any general definition, and stating the duty in minimum terms as applicable to the facts of this case, it may be said that the owners of control are under a duty not to transfer it to outsiders if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard —unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result. Thus, whatever the extent of the primary duty may be, circumstances may be sufficient to call into being the duty of active vigilance and inquiry: If, after such investigation, the sellers are deceived by false representations, there might not be liability, but if the circumstances put the seller on notice and if no adequate investigation is made and harm follows, then liability also follows.

From a careful reading of the voluminous evidence in this case, I have become convinced that facts and circumstances leading up to this sale, as known to Hepburn, the agent of the banks, and as largely relayed by him to Hardt, his immediate principal, were sufficient to indicate to any reasonable man in his position that the Boston group were acquiring the control of the corporation by improper means and for an improper purpose.

I have just referred to acquisition by improper means. What happened was that the buyers had arranged with Paine, Webber & Co. that the latter would advance the price of the purchase (some $310,000) on an unsecured loan, and that,

immediately after they had obtained control, the portfolio, or as much of it as was necessary, would be pledged with Paine, Webber & Co. as collateral, sold by them from time to time, the proceeds applied to liquidating the note, and the balance turned over. Comment as to the legality and ethics of this procedure is unnecessary, but the point is that if Hepburn had good reason to suspect that the purchase was to be financed in toto with the corporation's assets, it would be fair warning of the fraudulent nature of the whole thing. So, in considering whether the circumstances of this sale called for a real investigation, one matter of importance is what was known or to be inferred as to the manner in which the purchase was to be financed.

On turning to the record, one learns, with some surprise, that this same corporation had been systematically looted some five years before by a different group who bought control, using exactly the same means of financing the deal, and who stole the assets of the corporation in much the same general way. This episode was known in all of its details to Hepburn. In fact, the banks had become stockholders, unwillingly, as a result of the wreckage caused by it. In June, 1937, the persons responsible for the loss had settled their liability from some $650,000, of which perhaps half had come into the treasury of the corporation. This, of course, is not proof that a new group would do the same thing, but it certainly was a vivid reminder of the special dangers to which these small and helpless investment trusts were constantly exposed.

In the second place, by December, if not before, Hepburn knew perfectly well that in arranging for the sale of the banks' interests he had, in Blair, a collaborator who was entirely willing that the corporation's assets should be used to finance the deal. Even accepting at its face value Hepburn's testimony as to his own limited role in the negotiations, it is a fact that he was in frequent consultation with Blair, the corporation's president and the most active figure in promoting the various attempts to sell. Hepburn, Blair and Simmons constituted the executive committee of the board. During the entire summer of 1937 Blair had been busily engaged in conducting negotiations for the sale of the interest of the management group to an-

other financially irresponsible syndicate, headed by a promoter named Johnston. This sale aborted but, previous to that and for the purpose of getting rid of the determined opposition of the Continental Bank with its 26,569 shares, it had been arranged that Johnston should buy out the Continental Bank and that he should obtain the money on a loan from Fahnestock & Co. upon a promise that he would put up securities from the corporation's portfolio as collateral security after he obtained control of the corporation. This was exactly like the Paine, Webber financing of the Boston group later on in December. The sale to Johnston failed to go through, and Fahnestock, who had advanced the money to the Continental Bank and acquired its shares for the account of Johnston, was thus left holding the bag, with plenty of recrimination against Blair, who, they said, had arranged the whole thing and who, no doubt, had. It is undisputed that Hepburn got the whole story from Fahnestock & Co.'s attorney not later than October 15, and though he testified that he "never got to the bottom of the matter" and though Blair denied his part in the transaction, it is impossible that Hepburn could have been under any misapprehension as to what had occurred or as to the fact that Blair had actively participated in it.

Thirdly, Hepburn had fair notice that, whatever the plans of the purchasers might be, one part of their program was to have a large part of the corporation's assets converted into cash and available in that form the minute they took over control. It appears that the corporation had invested some $400,000 of its assets (including the cash received from the settlement of the suit against its earlier looters) in certificates of New England Fund—another investment trust of a somewhat different type. The terms of this trust provided that holders of these certificates could obtain either the cash value of the purchase or the underlying securities which they represented upon five days notice to the New England Fund. A special meeting of the board of directors of Insuranshares was called for December 16, five days before the date fixed for closing. The directors were advised that the purchasers wanted a resolution passed apparently authorizing Solomont without any restrictions to get the money from the New England Fund on December 21—the day to which the closing had been postponed (the five days' notice had already been given by Blair on the morning of the 16th). They balked at this, but finally did pass a resolution directing the New England Fund to transfer the certificates to Solomont upon his being elected and qualified as treasurer of Insuranshares. As a matter of fact, immediately after the consummation of the deal, Solomont flew to Boston with the certificates and succeeded in turning them into cash.

Fourthly, the inflated price paid by the Boston group for the banks' shares has already been considered as evidence that they were primarily interested in buying control, but I do not think it can be disregarded as being also some indication that they had an improper purpose in view. Why were the purchasers willing to pay so much for control? I should think this question might well have occurred to one who was selling it. No doubt if this corporation had been an industrial, mining, or commercial enterprise, whose physical assets and business might have potentialities which a purchaser might believe he could develop if given control, the price would not mean very much. It was, however, merely an investment company, and the ultimate assets—what was really being sold —were nothing but the ready equivalent of cash in marketable securities.

Fifthly, Hepburn and the banks were specifically warned at least twice of the danger of carrying out the deal with parties about whom they knew so little. Simmons, the corporation's lawyer, discussed the matter at length at a conference at which Hepburn was present, and embodied his thought in a memorandum, which Hepburn may or may not have received and brought to Hardt's attention. He "pointed out the possible consequences to you individually should Insuranshares suffer a loss through the operations of a group of men to whom you made possible the acquisition of the stock of the company." Johnston followed this on the same day by writing a letter to Hardt. Whether or not Hardt actually ever saw this letter, Hepburn was familiar with its subject matter and discussed it with Hardt.

There were other things of less importance, and they must all be read in the setting of the transaction, beginning as far back as June or July, 1937. There was simply too much of the sort of thing described for this transaction to pass as a

perfectly normal stock sale. I think that the circumstances were such as to indicate to any reasonable person to whom Hepburn's knowledge of what was going on could be imputed, that there was more than a possibility of fraud and consequent injury to the corporation in the sale. That being so, there plainly was a duty upon the sellers to make a genuine effort to obtain and verify such information as they reasonably could get about the means by which the purchase was to be financed and the character, aims and responsibility of the purchasers, or, in the absence of adequate information, to refrain from making the sale.

The Philadelphia banks made no adequate investigation. One or two desultory inquiries were made to who the purchasers were. Naturally, with a sale of this magnitude in the offing, anyone will make sufficient inquiry to satisfy himself that it is worth the trouble of further negotiations and that, if terms can be arranged, he is likely to get his money. That, it seems to me, is about the sum of what the banks did; and the sum of the affirmative information they obtained was that the purchasers were three Boston attorneys, one of whom (Solomont) had been local attorney for the Paine, Webber & Co., and that Morris was a reputable attorney. Of course, they had Blair's recommendation—a matter of somewhat equivocal force. In addition, Maloney, a friend of Hardt's and the president of the Philadelphia Life Insurance Company, reported to Hardt that he could discover nothing about Morris which would make him unsuitable as a director for the Philadelphia Life Insurance Company. Jackson and Curtis, brokers, reported to Hardt that "they knew of them (the buyers); they had no knowledge of their financial responsibility and knew nothing to their detriment." Surely, no one would suggest that the banks would have accepted this as satisfactory if they had been retaining any substantial stake in the corporation.

Specifically, the banks, with all their credit facilities made absolutely no investigation of the financial standing and resources of the purchasers and at no time received any information to indicate to them that the purchasers had any money whatever. They knew that money to pay for the stock would be somehow forthcoming through Paine, Webber. In spite of their knowledge of the methods in which

at least two previous fraudulent purchases of investment trusts had been financed by brokerage houses with the trusts' portfolios, they made no effort to find out what was to be behind Paine, Webber's certified check. As to the first of these points there can be no question that any sort of investigation would have revealed that the purchasers were not remotely able to finance a $300,000 deal from their own resources. As to the second, the performance of Paine, Webber & Co. throughout was so naive as to make it quite likely that, if any inquiry had been made, the whole method of financing would have been cheerfully disclosed. At any rate, it is not necessary to speculate as to what would have been the result if the duty of reasonable investigation had been performed. If, after inquiry, facts had been refused or misrepresented, a different question would be presented. The fact is that no genuine investigation was made.

I realize that it is expecting a great deal of businessmen, or anyone else, for that matter, to say that they should make searching inquiries which might result in disclosing facts which would upset an advantageous and apparently perfectly legal piece of business. And, by the same token, it takes no stretch of the imagination to conclude that Hepburn was not making any great effort to inform himself about the means which these three Boston lawyers were going to adopt to enable them to buy an investment trust for $300,000.

It is not proposed to make an analysis of the many authorities cited by the parties in this case. The complexities of cases involving liability for transfer of corporate management are so great and the facts so diverse that excerpts from court opinions are of comparatively little value. The facts of each decision must be known to fully appreciate the rule which it lays down. Cases more or less in point are: Field v. Western Life Indemnity Co., C.C., 166 F. 607; Id., 7 Cir., 179 F. 673; Oil Shares, Inc. v. Kahn, 3 Cir., 94 F.2d 751, reversed on other grounds, Oil Shares v. Commercial Trust Co., 304 U.S. 551, 58 S. Ct. 1059, 82 L.Ed. 1522; and Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163, 55 L.R.A. 751, 85 Am.St.Rep. 667.

The defendants do not deny the force of the authorities but take the position that in the present case, the banks at least owed absolutely no duty of any kind to the plaintiff corporation or its remaining stock-

holders. The point at which they draw the line is that the duty does not come into existence as to mere stockholders "except when those stockholders do not content themselves with the ordinary functions of stockholders, but take upon themselves the powers and prerogatives of directors." As a corollary to this proposition, the defendants contend that in cases where a duty does exist it is only in respect of direct dealings with the corporate property, and can never attach to dealings in its stock.

The fundamental difficulty with the defendants' position is that it fails to recognize that this case involves more than a question of liability—even that of majority stockholders, which these defendants were not—in respect of the sale of corporate stock. What is involved here, as has been pointed out, is a sale of control by a minority, but controlling, interest. The duties and liabilities in such case may be more than I have assumed them to be for the purposes of this case, but they are certainly not less. I have stated them as narrowly as possible, and I think that as so stated they are well grounded in the law.

Several minor and more or less technical questions raised by the defendants remain to be considered.

■ The bill in equity filed in this case might, under the old practice, have been open to the objection that it pleads two distinct causes of action, first, conspiracy to defraud, and, second, negligence. I have held that the owners of control of a corporation occupy a fiduciary relationship to the corporation and its stockholders in respect of the transfer of control and that they owe a duty of due care—a duty in which these defendants failed, with consequent loss to the corporation. This cause of action is sufficiently pleaded, and the charge of knowingly participating in a fraudulent conspiracy may be dismissed as surplusage. It was not established by the evidence, but the testimony directed to it has a bearing upon the alternative charge. The Federal Rules of Civil Procedure 28 U.S.C.A. following section 723c, are fully applicable, and Rule 8(e) (2) provides that: "A party may set forth two or more statements of a claim * * * alternately or hypothetically, either in one count * * * or in separate counts * * *."

■■ It appears that Paine, Webber & Co. have settled their liability to the corporation and that an instrument was delivered to them which, the defendants contend, operates as a general release and extinguishes the plaintiff's right of action against the remaining defendants. The instrument in question in words: (1) released Paine, Webber & Co.; (2) expressly reserved the plaintiff's rights against all other parties, including specifically Hepburn and the Philadelphia banks; (3) declared it to be the intent of the parties thereto that it should be construed and given effect as and only as a covenant not to sue; (4) expressed the plaintiff's covenant not to sue Paine, Webber & Co.; (5) declared that such covenant was not to affect or prejudice plaintiff's expressly reserved rights against any other parties.

The defendant invokes what has been called "one of those harsh, although strictly logical common-law, rules which has had to make way for the modern tendency to substitute justice for technicality." Walsh v. New York C., etc., R. Co., 204 N.Y. 58, 63, 97 N.E. 408, 410, 37 L.R.A.,N.S., 1137. Although the instrument at its beginning uses technical words of release, if read as a whole in the light of its plainly expressed and dominant intention to reserve the plaintiff's rights against all other parties, I think it must be construed as a covenant not to sue—particularly as the parties provide, "it being the intent of the parties that this instrument be construed and given effect as and only as a covenant by the party of the first part not to sue the parties of the second part." Even if these words were not present, I am of the opinion that a release coupled with an express reservation of the rights of the releasor against other joint tort feasors would not destroy those rights in any of the three possible jurisdictions (New York, New Jersey or Delaware) the law of which might apply. However, it is the law everywhere that a covenant not to sue does not affect the covenantor's rights against other joint tort feasors, and I think this instrument is plainly to be so construed.

The judgment to be entered here will be for the plaintiff generally. Further proceedings for the purpose of assessing damages and including the amount in the judgment may be taken unless an agreement can be reached upon that point.