**J. Douglas STREETT, Plaintiff-Respondent-Appellant,**

v.

**LACLEDE–CHRISTY COMPANY, a Corporation, Defendant-Appellant-Respondent.**

No. 51591.

Supreme Court of Missouri,
Division No. 1.

Nov. 14, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied Dec. 30, 1966.

Lashly, Lashly, Rava, Hyndman & Rutherford, John H. Lashly, Paul B. Rava,

Elihu M. Hyndman, St. Louis, for plaintiff-respondent-appellant.

Coburn, Croft & Kohn, Thomas L. Croft, Alan C. Kohn, Terrence L. Croft, John R. McFarland, St. Louis, for defendant-appellant-respondent.

HENRY J. WESTHUES, Special Commissioner.

This suit was based on an employment contract. It was filed in the Circuit Court of the City of St. Louis, Missouri. Plaintiff J. Douglas Streett, in Count I of his petition, stated that the defendant Laclede-Christy Company, a corporation, in June, 1954, employed plaintiff by written contract for a five-year period at a salary of $41,000 per year; that he was discharged on October 7, 1954. Plaintiff asked for a judgment of $177,050 on this first count.

In Count II, plaintiff stated that by the employment contract defendant agreed to pay plaintiff a bonus of $1,000 per year for the five years of his employment. He asked for a judgment for $5,000 on the second count.

The defendant filed a counterclaim asking for a judgment of $35,884.50 and punitive damages in the sum of $100,000 based on an alleged unauthorized expenditure of sums of money in willful violation of plaintiff's duties. Defendant denied any liability under the contract, stating that the contract was void and that plaintiff's discharge was justified because of his breach of duties. Defendant also claimed that plaintiff's recovery should be reduced for the reason that he refused like employment offered to him by another company.

The case was tried before the Honorable William H. Killoren without the aid of a jury. It was submitted to Judge Killoren but was not decided prior to his retirement. By agreement, the case was assigned to Judge William E. Buder on the record as made before Judge Killoren. Judge Buder entered a judgment against the defendant on plaintiff's first count in

the sum of $177,050 and a judgment in plaintiff's favor on Count II in the sum of $5,000. A judgment was entered on defendant's counterclaim in the amount of $25,884.50. A net judgment of $156,165.50 was entered in favor of plaintiff and against the defendant.

Defendant filed a motion for a new trial as did the plaintiff. Both motions were overruled and each party appealed to this court from the judgments entered by the trial court.

Defendant briefed four main points which are as follows:

"I. The decision below is reviewable by this court upon both the law and the evidence and without regard to the trial court's findings since the trial court ruled on the basis of the transcript and did not actually hear the evidence."

"II. The trial court erred in holding that plaintiff has a valid five-year contract as President, a Director, General Manager and Chief Operating Officer of Laclede-Christy at a salary of $41,000 per year."

"III. The trial court erred by awarding defendant inadequate actual damages and by awarding no punitive damages for Streett's intentional and wrongful acts in connection with his fighting the Porter offer, and the court erred in permitting Streett to recover on Counts I and II in view of the court's finding that Streett had violated his fiduciary duties by conducting such a fight with corporate funds."

"IV. The trial court erred in refusing to mitigate plaintiff's damages under Count I."

Defendant is correct in stating in his first point that this case is reviewable de novo by this court on the law and the evidence; further, that since the trial judge, the Honorable William E. Buder, did not hear the evidence, the rule of defer-ence to the trial court's finding of facts on disputed evidence is not applicable.

To rule on the other points, it is necessary to review the evidence.

Prior to 1951, the plaintiff was vice-president of Granite City Steel Company at a salary of $40,000 per year. He enjoyed a good reputation as a manager of large business enterprises. In the early part of 1951, the defendant corporation experienced difficulty with its president and general manager who had been employed by a written contract. The defendant terminated his employment and the plaintiff was hired at a salary of $41,000 per year. He was elected president and a director of the company. He became the owner of 1,000 shares of stock. The total number of shares outstanding was 265,815 at a par value of $5.00 per share.

Streett desired a written contract. However, the Board of Directors refused to enter into a written contract because the company had been required to pay salaries of former presidents after their employment had been terminated. Plaintiff's management of the defendant's business proved to be satisfactory and he continued without a written contract until June, 1954. In the early part of that year, rumors were afloat which appeared in the press that the assets of the defendant company and the shares of stock were for sale. This situation had an adverse effect on the business of the company. Employees felt insecure and customers were alarmed. To quiet these rumors and to stabilize the situation, plaintiff was given a contract which is the subject matter of this lawsuit. At one of the meetings of the Board, certain stockbrokers were requested to discontinue their efforts to sell defendant's business. Employees were assured that their employment was not in jeopardy. It was in these circumstances, which we have outlined very briefly, that the contract in question was executed.

It is defendant's theory that under the state law, Sec. 351.315 and Sec. 351.360,

V.A.M.S., and the bylaws of the company the Board of Directors could not legally contract to employ a president for five years; this, for the reason that the Board could not legally bind subsequent boards by any such contract.

Plaintiff contends that he was employed as general manager and that the Board had the legal authority to employ him as such.

In defendant's reply brief, it is stated: "Plaintiff's brief relies primarily on the proposition that a corporation may validly contract to hire a General Manager for five years at $41,000 a year. Such an argument is beside the point. Of course, there is no dispute that a corporation may hire a General Manager for five years at a salary of $41,000 a year. All the cases so hold and defendant did not contend to the contrary in its brief. But plaintiff is suing for a salary of $41,000 on a contract which specifically provides that that salary is to be paid to him, not as General Manager, but 'for his services as Chief Operating Officer.' Since plaintiff does not seriously dispute that the Chief Operating Officer of Laclede-Christy was the president, the question is the validity of a contract to employ a president for five years at a salary of $41,000 per year."

 In view of the statement by the defendant, we may reduce the issues to some extent and decide whether Streett was employed as a general manager or as president of the company. This question must be determined from the wording of the contract in the light of the circumstances existing at the time the contract was signed. Before we review the evidence on this point, let us see what is the status of a general manager of a corporation. In 19 C.J.S. Corporations § 756, p. 100, it is stated that "The office of general manager is of broader import than that of president. The fact that a person having an active conduct of the business of a corporation is also its president does not operate as a limitation on the powers usually exercised by its general agents or

managers; his authority is not limited to that possessed by virtue of his office as president, but is incidental to the management of the business."

The evidence disclosed beyond doubt that the Board of Directors of the defendant company was in dire need of a competent man to manage the affairs of the company. The defendant owned and operated a number of plants in various cities and states of the Union. The company had had difficulty in retaining a competent chief operating officer. As above stated, and we shall repeat it, at the time the contract was signed rumors of a change in the ownership of the business of defendant were current. It was shown that such rumors had demoralized the organization of the company. Employees felt insecure and customers were apprehensive about depending on orders for material being fulfilled. To quiet this unrest, plaintiff was given a written contract and employees were assured that their employment was not in jeopardy.

Now we shall consider portions of the contract material to the issues we are considering. In the contract, plaintiff was referred to as "Executive" and the defendant as "Laclede." Omitting a number of preliminary statements, a portion of the contract reads:

"1. Laclede and its present Board of Directors hereby employ Executive as General Manager and Chief Operating Officer of Laclede for a period of five (5) years beginning on the first day of July 1954, and ending on the 30th day of June, 1959, and Executive agrees to remain as General Manager and Chief Operating Officer of Laclede for such period and to perform the duties of General Manager and Chief Operating Officer during such period and to perform such other duties as may be assigned to him from time to time by the Board of Directors of the Company as constituted during such period, it being the expectation and understanding of the parties

hereto that at all times during the period of this agreement Executive will continue to act as Chief Operating Officer of Laclede."

It may be argued that the employment of Streett as manager and chief operating officer was equivalent to contracting to employ him as president. However, the Board in preparing the contract had this question in mind. Note that the paragraph following the one above quoted reads, "2. Laclede and its present Board of Directors, insofar as they can bind succeeding Boards of Directors, hereby employ Executive as President of Laclede for a period of five (5) years, beginning on the first day of July, 1954, and ending on the 30th day of June, 1959, and Executive agrees to remain as President of Laclede for such period and to perform the duties of President during such period."

A similar provision was made as to Streett's being a member of the Board of Directors. With regard to plaintiff's duties and obligations, the contract provided as follows:

"4. Executive shall devote all of his time and services exclusively to the business of Laclede during the term of this agreement. Executive will not enter into or conduct any other business and will perform the duties of his offices, and those assigned to him by the Board of Directors of Laclede, with fidelity and to the best of his ability."

■ It is our opinion that by the above provision of the contract, Streett bound himself to perform the duties of general manager and chief operating officer of the defendant company whether he was or was not elected president in any subsequent year. Streett also agreed not to engage in an other business during the five-year period. Such contracts are legal and may be enforced. In Re Paramount Publix Corporation, 2 Cir., 90 F.2d 441; Nikas v. Hindley, 99 Ga.App. 194, 108 S.E. 2d 98.

It is evident that by the contract the Board did not prevent any subsequent Board of Directors from electing a new president, nor did the wording of the contract prevent the stockholders from electing a member of the Board in place of Streett. The provision of the contract as to employing Streett as manager and chief operating officer constituted the very heart of the agreement. The point is ruled against the defendant.

During the month of August, 1954, representatives of the H. K. Porter Company made overtures to purchase the stock of Laclede-Christy. The group controlling Porter finally, in September and October, took over or gained control of Laclede-Christy.

■ In a number of subpoints under the general assignment of Point Three, as above set out, defendant contended that Streett violated his fiduciary duties by using corporate funds in trying to prevent the Porter group from acquiring control of Laclede Christy. Specifically, defendant stated that neither Streett nor the Board of Directors had authority to expend corporate funds to purchase stock on behalf of the company; further, that Streett had no right to employ Wertheim & Company and Georgeson & Co. and a firm of lawyers to aid Streett to fight the Porter company in its attempt to gain control of Laclede-Christy.

The evidence showed that the employment of Streett by a written contract to be the manager of the company for five years and the request by the Board that further efforts by brokers to sell defendant's business or shares of stock be discontinued had little effect. During the months of July, August, and early September, 1954, various offers were made to the Board to purchase the assets of the company; merger offers and offers to purchase the stock were also made. A number of these were not definite and the Board rejected all of them. A press release was made to the effect that Laclede

was not for sale. This appeared in a stock journal.

The Mercantile Trust Company of St. Louis and Walter W. Shipley were co-trustees of certain trusts which held about one fourth of all Laclede stock. Mr. Shipley was also vice-president and a member of the Board of Directors of Laclede-Christy. H. K. Porter Company offered to purchase the shares of stock held by the Trust Company and Shipley and all of the shares of the defendant at $20 per share. This offer was conditioned that at least 80% of the shares be deposited with the Mercantile Trust Company by September 20, 1954. This offer was sent to all shareholders on August 19, 1954, by the Trust Company. With the offer, the stockholders were advised that the Trust Company was willing to accept the offer. Other conditions were made, such as that the defendant company should not acquire any of its own stock and that no dividend in excess of .25 per share be declared. Numerous shareholders deposited their shares so that by September 14 over 51% of the stock had been deposited with the Trust Company. The Porter offer had been amended requiring the stock to be deposited by September 14, instead of by September 20. This was done for the reason that the Board of Directors of defendant company had declared a dividend as of September 16. Even though 80% of the shares had not been deposited, the Porter Company nevertheless purchased the 51% deposited giving it control of the corporation.

The Porter group lost no time in taking over the management of the defendant's business. Mr. Streett was asked when the new owners could take charge. The president of the Porter Company, a Mr. Thomas Mellon Evans, was told that he could attend the next Board meeting which would be held on September 23, 1954. On that day, five representatives of Porter appeared at the meeting. Mr. Evans demanded that all members of the Board, except Mr.

Shipley, who had been active in supporting the Porter group in obtaining the stock, should resign. Their terms of office would not expire until the following April. Evans demanded the resignations without any condition attached. The members of the Board refused. On October 4, 1954, a compromise was reached. Porter agreed to offer the remaining stockholders of Laclede $18.75 per share. This was the same price Porter paid the members of the Board for their stock. Streett resigned as president and as a member of the Board with the reservation that his rights under the employment contract should not be prejudiced. On October 7, 1954, the old Board resigned (except Shipley) and the Porter group took over. Streett was notified on October 12, 1954, that his services by the defendant company were no longer needed as of October 7, 1954. Thereafter, three of the company plants were closed. By 1958, the Porter group had acquired 99% of the stock of Laclede-Christy and the company was dissolved and the assets were distributed. The record indicated that the owners of the stock received in the neighborhood of $28 per share. That was the demise of a corporation which had been a clay refractories industry for over 100 years.

We shall now review briefly the actions of the Board of Directors of Laclede and Streett with reference to the offers to purchase the business and the shares of stock of Laclede by various concerns, especially that of the Porter group. On August 9, 1954, at a meeting of the Board, a number of offers to purchase the assets of the company were considered. All were rejected. A motion was then made to the effect that the company was not for sale and no further offers should be entertained. This motion was unanimously carried which indicated that Mr. Shipley voted for the motion. Streett then gave a press release to the Wall Street Journal, stating that the company was not for sale. The employees were also notified of the action of the Board. On August 18, 1954, Mr.

Shipley, who was then vice-president and treasurer of the defendant company, told Streett that the Porter group was interested in purchasing 80% of the stock of defendant. Streett discharged Shipley and informed him that he, Shipley, had voted in favor of the resolution that the company was not for sale. On the following day, August 19, 1954, all the stockholders were notified by the Mercantile Trust Company and Porter that the Porter group had offered $20 per share and that the trustees were willing to sell the stock held in trust.

On August 24, 1954, plaintiff Streett sent a letter to all shareholders advising them of the financial condition of the company. He stated in the letter that the net current assets of the company were $17.50 per share and that the net book value of fixed assets was $18.10 per share, or a total net book value of $35.60 per share. Streett also gave the shareholders information as to the general condition of the corporation. He informed the stockholders that he was giving them this information to aid them in making up their minds whether they wished to sell their stock.

On August 26, 1954, there was a special meeting of the Board at which Mr. Shipley resigned as vice-president and treasurer but not as a director. A dividend was declared. About this time, Mr. Streett changed his position with reference to the Porter offer. He testified that he had heard the Porter Company had taken over other corporations, had liquidated them and gained large profits; further, that the officers of the liquidated corporations had received ill treatment by the Porter group. Streett then sent a letter to the employees of Laclede informing them that he had investigated the Porter group and that he had made up his mind to fight the Porter offer. In this letter, he stated, "Since my last letter to you, I have further investigated the outfit and will do everything within my power to keep our group from falling into their hands." Streett also sent a telegram to the shareholders advising them not to deposit their stock with the Mercantile Trust Company. Streett also sent a letter to the shareholders advising them of the information he had obtained about Porter and urged the shareholders not to sell their stock.

On August 27, 1954, Streett purchased, on behalf of the company, 2900 shares of Laclede stock from a brokerage house. The price paid ranged from 19⅞ to 20¼ per share for a total of $58,819.61. Sometime late in August or early September, 1954, Streett and William H. Armstrong, who was a member of the Board and also legal advisor to the company, went to New York. While there, they employed Wertheim & Company. Streett testified that this company was employed to advise and assist in merger negotiations between Laclede and Hydraulic Press Brick Co. of St. Louis. However, one of the purposes of employing Wertheim was to prevent the Porter group from gaining control of Laclede-Christy. It was agreed that if Porter were defeated, Wertheim would be paid $25,000; if not, Wertheim would receive $15,000. Wertheim was paid $15,000 before Streett resigned as president of Laclede. This item of $15,000 and other such items are the basis of defendant's counterclaim, such as $2,555.40 paid to a New York law firm and $3,000 to Georgeson & Co. The Armstrong law firm was paid $14,500, $5,500 of which defendant claims was for legal services in fighting the Porter group. Georgeson & Co. were proxy soliciting specialists. The above items were allowed and charged against the plaintiff by the trial court, except the amount paid to the Armstrong law firm. Let us concede for the purpose of this case that these items were paid out of corporate funds to fight the Porter offer. Defendant claims they were all paid without approval of the Board of Directors; further, defendant claims that even if approved, the Board had no authority to expend funds for the purpose of preventing the Porter group from gaining control of the corporation.

The actions taken by Streett and the Board of Directors in attempting to prevent the Porter group from taking over Laclede-Christy must be viewed in the light of the circumstances confronting them at the time. One of the factors to be taken into account is that the Porter offer was conditioned on the event that 80% of the stock should be deposited with the Mercantile Trust Company to make the offer binding on Porter; that fact indicated that Porter may have had in mind liquidation of the corporation. It was in evidence that the current assets about equaled the offer made by Porter. This would have made it a profitable transaction for the Porter group. We must add that the Porter group had liquidated a number of other companies after gaining control. We also take into account that Mr. Shipley, a vice-president, treasurer, and member of the board of Laclede, and a cotrustee of a large block of stock, was actively promoting the sale to Porter. This was true even though he had voted for the resolution that the company was not for sale.

In the circumstances, the officers and Board of Directors were justified in concluding that their company, which had been in operation for over 100 years, was in grave danger. Subsequent events confirmed that fear. The actions of the Board through the months of June, July, August, and the first part of September, 1954, clearly indicated that it was their policy not to sell but to keep the company as a going business. Many employees, officers, and shareholders were interested. It was the judgment of the Board that it was best to continue the company in its business. The actions of Streett, while not shown to have been approved by the minutes of the company, were nevertheless known to and approved by all of the members of the Board except Mr. Shipley.

Note some of the evidence in support of the theory that the Board of Directors deemed it to be the best policy to fight the Porter acquisition. Plaintiff Streett testified by deposition as follows:

"'Question: Did you take up with the board of directors specifically the question as to your right to spend corporate funds to fight the Porter offer?

'Answer: The board of directors specifically authorized me to employ at a fee a firm of New York consultants to fight this, specifically, to fight it, and that is authorizing the use of corporate money to fight this acquisition.

'Question: What firm do you refer to?

'Answer: Wertheim and Company.'"

Mr. J. LeBeau Christy, a member of the Board of Laclede-Christy, testified that his father had been president of the company many years ago; that the witness had been with the company for many years. With reference to the opposition of the members of the Board, with the exceptions of Mr. Shipley, to the Porter offer, he stated:

"A We were trying to preserve a going company, a company that had been operating for over a hundred years, and had some thousand or twelve hundred employees. Some of them had been with the company for many, many years, and we were trying to preserve that company and keep it a going company here for St. Louis and the employees that had been so faithful to it."

The actions of Streett, as president and general manager, in fighting the Porter group were in good faith and in harmony with the policy adopted by the Board of Directors.

We rule that the expenditures made by Streett should not have been charged against him. We are supported in this ruling by the following authorities: Rosenfeld v. Fairchild Engine and Airplane Corp., 309 N.Y. 168, 128 N.E.2d 291, 293, 51 A.L.R. 2d 860, where the court had this to say: "The rule which we adopt is simply this: In a contest over policy, as compared to a

purely personal power contest, corporate directors have the right to make reasonable and proper expenditures, subject to the scrutiny of the courts when duly challenged, from the corporate treasury for the purpose of persuading the stockholders of the correctness of their position and soliciting their support for policies which the directors believe, in all good faith, are in the best interest of the corporation." A similar ruling was made in the case of Hall v. Trans-Lux Daylight Picture Screen Corporation, 20 Del.Ch. 78, 171 A. 226. See also Insuranshares Corporation v. Northern Fiscal Corp., D.C., 35 F.Supp. 22, l. c. 25[2], and Rascovor v. American Linseed Co., 2 Cir., 135 F. 341.

■ The stock transaction, that is, the purchase of the 2900 shares on behalf of the corporation, is particularly challenged by the defendant. The contention that the Board of Directors did not authorize the purchase, and even if it had the action would have been beyond its power, must be decided against the defendant. The Articles of Association of Laclede-Christy provided it could sell and purchase its own stock. The evidence did not show that the Board of Directors authorized Streett to purchase this stock. However, Streett acted in good faith and believed it was in the interest of the corporation. The trial court charged the sum of $4,444.61 on this item. This was based on the theory that at the time Streett purchased the stock, the market value was $18.75 per share and that Streett paid slightly more than $20 per share. The Porter group paid $20 per share and obtained over 51% of the stock at that price. Streett purchased the stock in question about the same time. This was considered a good buy. Note the evidence given in a deposition by Mr. Evans, President of the Porter Company, with reference to the purchase of the stock:

" 'Question: If my recollection is correct, if he bought it at $20 a share it would have been $58,000, is that correct?

'Answer: I believe that is correct.

'Question: If you had bought the stock through the Merchantile Trust Company you would have paid $58,000, is that correct?

'Answer: I believe that is correct.' "

Streett paid $58,819.16. The ultimate result was that the Porter group received the benefit of the shares purchased by Streett. We are unable to see wherein the corporation was damaged by this transaction. There being no damage, this item should not have been charged against Streett. In 19 C.J.S. Corporations, § 796a, p. 177, we note the following: "A corporation's purchase of its own stock is within the control of the directors in the exercise of a sound judgment, and the directors in purchasing such stock for the corporation are not guilty of a breach of their fiduciary duty where the purchase is within the powers of the corporation, is made at a price not in excess of the market price, and does not cause legal harm to anyone." Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895.

■ The final point is whether the trial court erred in refusing to mitigate plaintiff's damages. It is urged that Streett could have earned $41,000 per year at Scullin Steel where Streett was employed after his discharge by defendant. After Streett was discharged on October 7, 1954, a Mr. Judge, then president of Scullin Steel Company of St. Louis, called Streett for the purpose of employing him at Scullin Steel Company. Judge discussed with Streett the question of employment as an executive vice-president. Streett accepted the employment at a salary of $18,000 per year beginning January 17, 1955. Streett remained with the company until February 8, 1955, when he resigned. Defendant claims that if Streett had remained with Scullin Steel, it could be assumed, he would have been made president when Mr. Judge retired. Defendant also claimed that Streett would have had large stock option rights which would have enhanced his compensation to equal the salary he had received at Laclede-Christy.

The assumption that Streett would have become president of Scullin Steel and that he would have had an option on a large block of stock were both speculative and very uncertain. Judge testified that he did not discuss with Streett or anyone else the question of Streett's succeeding Judge as president. Judge testified that Streett's principal duties at Scullin were such as would relieve Judge of certain duties as president. As to the stock option, Judge's evidence by deposition was as follows:

" 'Question: Was the subject of a written contract discussed with you?

'Answer: No, not at that time, there was something came up later on about a stock option for Mr. Streett which was discussed by the Board of Directors and that was talked about in the Board and would have been—well, it got to the place where it would have been put to the stockholders for a vote because we never had any stock option in the company prior to that time, but that was never consummated when Mr. Streett left.' "

Streett testified that soon after he was employed by Scullin he learned that a Mr. Louis Wolfson was interested in gaining control of Scullin stock. Wolfson had made some efforts to get control of Laclede-Christy during 1954 before the Porter group took over the company. Streett testified that Wolfson was known as a man who liquidated corporations upon acquisition. Subsequent events justified Streett's conclusion. Wolfson did obtain control of Scullin Steel.

Mr. Judge testified that the Universal-Marion Corporation, which company apparently was controlled by Wolfson, acquired enough stock to take over full control of the company. Note the evidence of Mr. Judge on this point:

" 'Question: Was that acquisition made by the purchase of stock on the open market from the then stockholders?

'Answer: I think some of it was; in fact, I am pretty sure that there was one block of stock that was held in New York by some individual that they acquired, it was quite a large block of stock.

'Question: Now, I have in mind the name of a man named Louis Wolfson, do you know him?

'Answer: Yes, he is the man—he don't appear as an officer of any of these companies, but he is the man that really has all of the money and the control of these companies.

'Question: He is the one that bought it, in effect, is he, through a corporation that he owned?

'Answer: Well, there was some sort of—he had other people with him, that is something I couldn't tell, it went into the hands of different individuals, not all to Mr. Wolfson, he had a certain amount of it, but there was other people, probably associates of his, that had large blocks of stock, I suppose that is done every day with these companies, these mergers.

'Question: Now, following the acquisition of the controlling interest in Scullin Steel Company by the Universal-Marion Company, did the Board of Directors change in terms of personnel?

'Answer: It didn't change any of the personnel until I retired in August, and then Mr. Pettus succeeded me as President, and I had been in the interim, betwen April and August, made a member of their Board of Directors but just as soon as I retired, I resigned from the Board of Directors immediately. I didn't stay on, so I don't know anything about their inner workings at all.

'Question: Do you know who is on the Board now?

'MR. CROFT: Of what company?

'MR. LASHLY: Oh, is there a Board?

'Answer: No, no Scullin Board any more, it is Universal-Marion Corporation

with headquarters in Jacksonville, Florida.' "

So, Scullin Steel Company was, as Laclede-Christy had been, quietly laid to rest.

It is apparent that the position Streett had with Scullin Steel was not comparable to that he had had with Laclede-Christy. Compensation was much less, the rank or grade of position much inferior, and the permanency of the position was speculative. Streett was justified in resigning his position with Scullin Steel Company. Osadchuk v. Gordon, 251 Mass. 540, 146 N.E. 781.

 In a case of this nature, the burden is on the defendant to show mitigation of damages. In the case before us, the weight of the evidence is on the side of the plaintiff. Rich v. Daily Creamery Co., 296 Mich. 270, 296 N.W. 253, 134 A.L.R. 232; Tenzer v. Gilmore, 114 Mo.App. 210, 89 S.W. 341.

In a memorandum opinion, the trial judge (Honorable William E. Buder) in this case, stated the rule of law applicable to the situation we have before us, citing authorities that support his conclusion. We quote a portion of his opinion: "It is the general rule that an employee who· is wrongfully discharged is not obliged to seek or accept other employment of a different or inferior kind in order to minimize the damage. Mitchell v. Lewensohn, [251 Wis. 424], 29 N.W.2d 748; Shiller [Schiller] v. Keuffel & Esser Company [21 Wis.2d 545], 124 N.W.2d 646. The aggrieved party is not compelled to enter into any type of employment, and is permitted to decline a position which will degrade or lower his calling or usual means of support. Canning v. Star Publishing Company [D.C.], 130 F.Supp. 697. The servant is free to accept employment or reject it according to his uncensored pleasure. McClelland v. Climax Hosiery Mills, [252 N.Y. 347], 169 N.E. 605. The question is whether plaintiff had used reasonable diligence and had done the best that he could under prevalent mercantile conditions and opportunities. Osadchuk v. Gordon, [251 Mass. 540], 146 N.E. 781."

The judgment of the trial court for plaintiff and against the defendant on Count I of the petition in the sum of $177,050 and the judgment for plaintiff on Count II of the petition in the sum of $5,000 are hereby affirmed.

The judgment in favor of the defendant on its counterclaim against the plaintiff in the sum of $25,884.50 is hereby reversed.

The trial court is directed to enter a total judgment in favor of plaintiff and against the defendant in the sum of $182,050 as of the day of the original judgment.

It is so ordered.

PER CURIAM.

The foregoing opinion by HENRY J. WESTHUES, Special Commissioner, is adopted as the opinion of the court.

All of the Judges concur.